its findings, including the plaintiffs in this action, or those lacking first-hand knowledge of the facts. The Report mischaracterizes facts in a manner that is unfavorable to the Board, demonstrating the CHRO was biased in its "investigation." As such, it fails to satisfy the indicia of reliability required by Rule 803(8)(c).

    1.    The CHRO's Report was issued after a public forum that was neither a "final hearing" nor an adversarial proceeding in which the Board could cross-examine <u>witnesses</u>.

The Report was <u>not</u> generated after an adversarial hearing in which the parties had the opportunity to examine and cross-examine witnesses. Instead, it was made after reviewing a snapshot of information provided from random individuals having no first-hand knowledge of the Board's past hiring practices.

The CHRO received a report from the NAACP and a newspaper article from the <u>Waterbury American-Republican</u> that questioned the Board's past hiring practices. Exhibit A, pp. 1-3. Based on this information, the CHRO, on its own initiative, decided to hold a public hearing pursuant to General Statutes. § 46a-56(a)(2). Based on the information presented at the hearing, the CHRO issued its Report as a "recommendation to officers of the state" to ensure equal employment opportunities. <u>Id</u>.

16

The hearing was simply an open forum in which any person could present information to the CHRO. It was not the type of hearing in which the Board, the subject of the proceedings, could cross-examine witnesses in order to refute the evidence presented. There is no formal appellate process that the Board can undertake to reverse its findings. Accordingly, the Report is, at best, a preliminary finding that is based on hearsay evidence.

    2.    The CHRO's Report is based on multiple levels of hearsay that would not be admissible at trial and was provided by persons having an interest in the <u>outcome of the proceedings.</u>

The entire basis for the CHRO deciding to "investigate" the Board's practices rested on hearsay. Admittedly, its "investigation" was prompted by a series of articles in the <u>Waterbury Republican-American</u> and by reports submitted by the Waterbury NAACP about the Board's hiring practices. (Exhibit A, p. 1). These hearsay and prejudicial reports were not only relied upon by the CHRO, they were made exhibits to its Report and accepted as true. <u>Id.</u>

During its investigation, the CHRO relied heavily upon statements given by those who spoke at its public hearing in April 2000. (Exhibit A, p. 35-37). Nearly all of these individuals lacked any knowledge of the facts concerning Waterbury's hiring process. Yet

17

the CHRO included their anecdotal statements as "evidence" that Waterbury's hiring

processes were discriminatory.  For example, the CHRO credited comments from

Waterbury "residents", the NAACP Chapter President and from the plaintiffs themselves.

The fact that the CHRO credited Heard-McKnight's and Tilghman's testimony really

precludes any finding that its Report has the indicia of reliability required by Rule

803(8)(C).  Although Tilghman and Heard-McKnight are clearly biased witnesses, the

CHRO accepted their testimony as true.  The CHRO cited Tilghman as stating:  "It was

told to me that the problem with me was the color of my skin, the type of car that I drove.

Who did I think I was."  The CHRO then called the non-renewal of Tilghman's and

Heard-McKnight's Contracts "disturbing".  (Exhibit A, p.20-23).  In fact, the Report

contains three pages of detailed testimony regarding what it conveys as unfair treatment by

Borrelli.  Plainly lacking from the Report, however, is Borrelli's explanation as to why he

recommended the non-renewal of their contracts.

        The Report is obviously a summary of hearsay that was provided by persons

having an interest in the CHRO's findings.  The very foundation of the CHRO's Report is

therefore unreliable.  At the very least, these facts preclude the Report from passing

**SHIPMAN & GOODWIN**® LLP  •  *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

scrutiny under Rule 803(8)(C).  At worst, however, they demonstrate that the CHRO was a biased tribunal.

### 3. The CHRO was a biased tribunal whose conclusions purport to express an expert opinion.

The CHRO's Report is riddled with statements that misconstrue the evidence in a manner that is unfairly prejudicial to the Board.  Moreover, the CHRO prejudged the Board's evidence as being unworthy of belief.

For example, the CHRO twisted evidence regarding the Board's affirmative action plan.  Then Mayor Philip Giordano asserted that his signature, which appeared on the plan, was a forgery.  However, the CHRO embellished this testimony stating "the fact that the mayor would deny ever having signed the plan calls into question his commitment to the affirmative action plan."  (Exhibit A, p. 5).  Thus, the CHRO took the Mayor's statement that his signature was forged and transformed it into a comment that insinuated he would never sign *any* such plan.

In addition, the CHRO noted that the Board had made laudable efforts to increase its minority hiring in 1999.  However, it then discussed these efforts, stating:  "While these efforts to recruit and hire more minority candidates may be lauded, the following

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT  06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

statistics unfortunately show little change in the face of the teachers and administrators

from 1998-1999". (Exhibit A, p. 16).

The CHRO's bias comes through loud in clear when it specifically dismissed

Borrelli's explanation of the evaluation process he used in 2000. Despite having

acknowledged Borrelli's explanation, the CHRO rejected it stating:

> Based on the testimony [presumably Tilghman's and Heard-McKnight's], it
> appears that there was very little interaction between Borrelli and either
> Heard-McKnight or Tilghman. To the contrary, there were cancelled
> meetings, few if any visits to the schools and little teacher input.

Exhibit A, p. 23. This is a clear example of the CHRO taking it upon itself to summarily

dismiss the legitimate reasons of Borrelli, which is the issue for the jury to decide. What

is worse, the CHRO then accused Borrelli of treating them in a "disturbing" manner.

Simply stated, the CHRO was unwilling to believe any non-discriminatory reason for the

plaintiffs' non-renewal and the Report would unfairly influence the decision of the jury,

which must hear and evaluate all the evidence.

These circumstances compel the finding that the CHRO had pre-judged the

evidence and prepared a faulty report. This is not the type of reliable document that

satisfies Rule 803(8)(C). To complicate matters, the CHRO then uses the aforementioned

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

evidence to conclude that the Board's past hiring practices were in fact discriminatory.

This is nothing short of a conclusory opinion as opposed to a compilation of reliable facts.

### C.   THE PREJUDICIAL EFFECT OF THE CHRO'S REPORT SUBSTANTIALLY OUTWEIGHS ITS MINIMAL, IF ANY, PROBATIVE VALUE

Even if the CHRO's Report could satisfy Rule 803(8)(C), the court should

nevertheless exclude it under Rule 403.  The Report unquestionably presents a risk of

unfair prejudice, confusion of the issues, waste of time and the needless presentation of

cumulative evidence.  Paolitto, supra at 65.  More specifically, (1) the Report contains

many conclusory findings against the Board and a reasonable jury will feel compelled to

reach the same conclusions; (2) the Report accuses the Board and its attorneys of being

dishonest; (3) admission of the Report would force the Board to present evidence that

refutes the CHRO's findings which will prolong the trial and confuse the jury.

#### 1.   The Report will compel the jury to believe that it must reach the same conclusions as the CHRO.

Any juror who reads the Report will be forever unable to view this case through

objective lenses.  The CHRO is the state agency responsible for addressing issues of

discrimination and reasonable people would conclude that its conclusions about

discrimination are pre se reliable.  Therefore, jurors would likely conclude that the

21

CHRO's conclusions are a form of "expert testimony" and they will be compelled to reach the same conclusions. Once tainted by the CHRO's conclusions, the jury will be hopelessly confused the Board's alleged past practices with the issues in Heard-McKnight's case.

For this very reason, several courts have excluded reports from the EEOC. For example, in <u>Hall v. Western Production Co.</u>, <u>supra</u> at1058, the Court of Appeals for the Sixth Circuit held:

> In refusing to admit the WFEC report into evidence, the district court determined that all the evidentiary matter before the WFEC could be presented to the jury ...and therefore, the only purpose to be served by admitted into evidence the WFEC report *would be to suggest to the jury that it should reach the same conclusion as the WFEC.* The district court further determined that the risk of unfair prejudice as to the plaintiff substantially outweighs any relevance of the WFEC findings of fact... (emphasis added).

Similarly, in <u>Johnson v. Yellow Freight Systems Inc.</u>, 734 F. 2d at 1309-1310, the district court excluded an EEOC Reasonable Cause finding because of its prejudicial affect. The Eighth Circuit Court of Appeals affirmed, holding:

> To admit the report under these circumstances would amount to admitting into evidence the opinion of an expert witness as to what conclusions the jury should draw, even though the jury had the opportunity and the ability to draw its own conclusions from the evidence presented...

22

EEOC reports are further problematic because they often contain statements and conclusions that are characterized in such a manner that the jury feels compelled to accept them as true. In Hairston v. Washington Metropolitan Area Transit Authority, supra, 1997 US. Dist Lexis at *11-12, the district court excluded a letter finding of the EEOC. The letter contained an assertion that it was "a determination on the merits of the charge." Id. The court held that this statement and the legal questions that followed presented an unfair prejudice to the defendant. Id.

If admitted, the jury will consider the CHRO's conclusions to be a form of expert testimony. It will feel that because the CHRO says so, the Board *must have* engaged in prior acts of discrimination. Therefore, it will be looking to punish the Board in this case for what it believes are past transgressions. The Report is effusive with the utmost prejudicial remarks and no jury could view this case objectively after reading it. Even a cursory review of the Report makes this fact undesirable.

First, the very title of the Report is prejudicial to the Board. The CHRO has named the document its Report on Employment Practices in the Waterbury School District and characterizes its conclusions as *Findings of Fact*. Exhibit A, p. 2. Any jury would naturally infer this is an "official" document that is per se reliable. Thus, after just

23

reading the title, a fertile seed of doubt about Borrelli's credibility will be embedded in the

jury's mind.  After reading the CHRO's *Findings of Fact*, that seed will grow beyond the

control of any limiting instruction.  The jury will simply be unable to set aside their

preconceived ideas about Borrelli after reading *findings of fact* such as the following:

- Teachers and administrators in the Waterbury School system have historically not been hired through an open and competitive process...the result, in part, was a very low representation of minorities among Waterbury's teaching and administrative staff (p. 4);
- The Board of Ethics also investigate Waterbury's hiring procedures...and cited the Board of Education members for indiscretions...(p. 7-8);
- The findings of the Board of Ethics confirm that an atmosphere existed in which there was a degree of inappropriate influence in the hiring process of the Board of Education...and ultimately resulted in the city failing to seek or encourage minorities to apply.  (p. 9);
- State officials also raised concerns about Waterbury's hiring procedures (p. 9);
- The inability of the city to establish and maintain this committee only serves to reinforce the notion that the city is not fully committed to improving its representation of minorities in its teacher and administrator ranks (p. 13);
- The testimony of Tilghman and the Statements provided by Heard-McKnight indicate Borrelli did not follow his own evaluative criteria (p. 22)...
- There could be a direct correlation between the city's failure to properly implement its minority recruitment retention plan and the loss of several new minority hires ( p. 24);
- The City's failure to renew Irvin's contract casts doubt over its commitment to continue the recruitment efforts he began Id.

The CHRO's *CONCLUSION* is that:

24

> [T]he City of Waterbury utilized a hiring system for teachers and administrators that lacked adequate safeguards to prevent, at the very least, the appearance of favoritism and at worst, decisions that led to drastic under-representation of minorities in those positions. Board of Education members voted for family members or friends, openings were not properly advertised and the city made little efforts to attract and retain qualified minority educators. (p. 33)

These are not mere suggestions that a discriminatory practice may have taken place. They are outright assertions that the Board has taken an active role in discriminating against minorities. The Report tells the jury that Heard-McKnight's allegations are "disturbing" and that Borrelli is unworthy of belief. It tells the jury to "cast doubt" on the Board's intentions to retain minorities. Even with the most limiting instruction, no reasonable jury could view this case objectively after reviewing the Report.

The Report also contains <u>eight pages</u> of *recommendations* about what *it believes* the Board must do to end the alleged discrimination. Exhibit A, pp. 25-33. After dedicating one-third of its Report to these "recommendations" the CHRO states: that the "[f]ailure to implement these recommendations will result in a return to the "closed door" hiring system that prevented qualified minority candidates from attaining teaching and administrative positions within the city." Thus, the jury will condemn the Board upon

SHIPMAN & GOODWIN® LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

hearing any evidence that it chose not to implement even any of the CHRO's

recommendations.  Again, no limiting instruction can mitigate these effects.

>    2.     No limiting instruction by the court can remedy the CHRO's comments
>           about <u>the Board and its attorneys.</u>

The CHRO's Report will create an immediate distrust of the Board <u>and</u> its

attorneys.  The CHRO has accused the Board and its counsel of refusing to cooperate and

in fact being dishonest during the public hearing process.  These statements, although

untrue, will inevitably destroy the Board's and its attorneys' credibility.  The following

citations bear this out:

- The city representatives are not able to provide sufficient assurances to the Commission that the [minority recruitment] activities as reported would be continued in the future (p. 2);
- In response to the City's *refusal* to file the contract compliance monitoring report, the CHRO reviewed its enforcement options...(p. 3);[9]

These statements insinuate that the Board was being secretive and trying to hide

information from the CHRO.  The jury will draw one obvious conclusion from the Report;

the Board cannot be trusted.  The CHRO's accusations about the Board's attorneys are

equally harmful.  The CHRO requested information from the Board after the public

---

[9] The fact that the Report also states that other agencies such as the Board of Ethics have found against the Board serves to further diminish the Board's credibility.

26

forum. The CHRO then said the Board provided "minimal helpful information." (p. 33).

To support its assertion, the CHRO misstated the record, stating:

> For example, the CHRO asked what money had been budget for recruitment and retention of minority teachers and administrators for 2000. The city responded by stating that the budget included funding, but did not specify how much or towards what the proposed money would be spent. (p. 33-34).

The truth is, however, that the CHRO did not ask the Board's attorneys to specify how much money had been marked for minority recruiting. See Appendix to Exhibit A. Instead, the CHRO simply asked "what, if any, line item has been included in the Board of Education's 00-01 proposed budget for recruitment and retention of minority teachers and administrators?" Id. The Board's attorney responded that "the Board of Education budget for the 2000-2001 school year that contains funding for recruiting, including funding for extensive advertising of all teacher and administrator vacancies." Id.

The CHRO's Report states that it asked the Board specify the money that it intended to spend on specific recruiting efforts. This is not accurate. It simply asked if the Board had a line item concerning minority recruiting. Id. The Board adequately answered the question, but the CHRO condemned it for not providing information that was never requested. The tone of the CHRO's Report further implies that the attorneys were

27

deliberately not providing information that it had requested. This can only cause the jury to distrust the Board's counsel.

The CHRO goes so far as to accuse the Board's attorney of dishonesty. In response to the CHRO's inquiry, the Board's attorney stated that the Board had many meetings towards minority recruiting efforts. Id. After the CHRO conspicuously quoted the phrase "many meetings", suggesting the attorney was being dishonest, the CHRO then stated:

> The CHRO *questions* this assertion, however, as one of its own employees has participated on that committee *in the past*, but is currently unaware of any recent activities involving that committee.

The CHRO has categorically and without qualification stated that the Board and its attorneys are unworthy of belief. No reasonable jury will be able to set these statements aside when viewing the case. What is more, the CHRO questions the Board's credibility on the grounds that someone who used to be on a certain committee, but is no longer on that committee, was unaware of the Board's activities. Obviously, this former member would have no knowledge of current activities. What comes through in vivid detail, however, is the CHRO's willingness to search for evidence outside the record in order to make a finding against the Board.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

The cumulative effect of all the CHRO's statements will force the Board to endure an undeniable prejudice at trial. Not only has the CHRO said the Board committed a discriminatory practice, it has accused the Board and its attorneys of dishonesty and hiding information. No reasonable juror can disregard this evidence.

    3.    The admission of the Report will prolong the trial and confuse the jury.

Based on the Rule 403 balancing test, the court should exclude the Report because it will unduly lengthen the trial and confuse the jury. See eg Hairston v. Washington Metropolitan Area Transit Authority, supra at *12 (Holding that "if the [EEOC] letter were to be offered in evidence, it is likely that the plaintiff would have to spend additional time at trial attempting to explain what this letter means as well as its significance to the jury. For these reasons, the Court finds that the low probative value of the letter is substantially outweighed by the danger of unfair prejudice and waste of time.")

The CHRO's Report in this case exceeds fifty pages. It cited nearly 100 exhibits and relied upon the testimony of 25 witnesses. Exhibit A. It references several statistics that have little to no context or explanation. If the court admits the Report, the Board will be forced to spend substantial time at trial refuting the CHRO's findings. This

29

may take several days or even weeks to complete. The trial will be lengthened immeasurably.

What is more, this unnecessary yet voluminous evidence at trial will unnecessarily confuse the jury, resulting in further prejudice to the Board. During the presentation of this evidence, the jury will improperly focus on the Board's past hiring practices as opposed to whether Heard-McKnight was non-renewed because of her race. This despite the fact that McKnight was hired when the CHRO applauded its efforts to recruit minorities. Because the Report has no probative value, the court should not risk a lengthy and confusing trial by admitting the Report.

## IV.    CONCLUSION

The CHRO's Report is the summary of its "investigation" of what it believes was a past discriminatory hiring practice. It is not in any way probative of whether Borrelli, who was not employed by the Board when those practices occurred, discriminated against Heard-McKnight. The Report is also inadmissible hearsay that does not satisfy the exception set forth in Rule 803(8)(C). It contains so many adverse statements about the Board and its attorneys that its non-existent probative value is substantially outweighed by its prejudicial effect. The Court should therefore exclude the Report in its entirety.

30

THE DEFENDANT,
MATTHEW BORRELLI,

BY: _____

Gary S. Starr
Fed. Bar No. ct 06038
Stephen M. Sedor
Fed. Bar No. ct 21117
Shipman and Goodwin, LLP
One American Row
Hartford, CT 06103-2819
Phone: 860-251-5000
Fax:    860-251-5500

31

## CERTIFICATION

This shall certify that a copy of the Defendant's First Motion in Limine was mailed, postage prepaid, to the following counsel of record on this 10th day of May, 2004.

John R. Williams
Williams and Pattis, LLC
51 Elm Street
New Haven, CT 06510

Stephen M. Sedor

370289 v.01 S2

32