Exhibit A

RECYCLED



REPORT ON

# Employment Practices in the Waterbury School District

PRESENTED BY

*The Connecticut Commission on Human Rights & Opportunities*

SEPTEMBER 2000

HEARD 403

# Employment Practices in the Waterbury School District

## *Table of Contents*

I.       Introduction............................................................................ 1

II.      Executive Summary............................................................... 4

III.     Findings of Fact..................................................................... 5

         (A) A Historical Overview ................................................... 5

         (B) Recruitment and Hiring ............................................... 11

                 1) History ............................................................... 11

                 2) Irvin's Recruitment and Hiring Efforts...................... 13

         (C) Retention ..................................................................... 20

IV.      Recommendations ............................................................. 25

         (A) As to the General Assembly ........................................ 25

         (B) As to the City of Waterbury ........................................ 28

V.       Conclusion ....................................................................... 33

VI.      Selected Testimony .......................................................... 35

VII.     Selected Exhibits ...........................................(separately provided)

VIII.    List of Exhibits

IX.      Appendix

HEARD 404

# I.    INTRODUCTION

In the Spring of 1999, the Waterbury Republican-American newspaper published a series of articles that raised concerns about the employment practices of the Waterbury Board of Education with respect to the hiring and retention of minority teachers and administrators. In addition, the newspaper reported that the city did not adhere to its own affirmative action plan by failing to post and advertise teaching vacancies, by failing to send job announcements to various community groups, such as the National Association for the Advancement of Colored People (NAACP), and by failing to establish networks with agencies that have contact with qualified minority applicants.[1]

At its monthly meeting on July 8, 1999, and at meetings in September, November and December, 1999, the Commission on Human Rights and Opportunities (CHRO) received a report[2] and other comments from the President and Vice President of the Waterbury NAACP regarding the hiring process of the Waterbury Board of Education. The NAACP had also been in contact with the State Department of Education (DOE) Commissioner Theodore Sergi. The NAACP expressed concerns that Waterbury's hiring system was flawed and negatively impacted the minority student population. The report and the NAACP's concerns raised further questions regarding a historical pattern of unfair treatment in the recruitment, hiring, and retention of minority teachers and administrators. The NAACP also claimed that the unfair practices of the city resulted in an under-representation of minorities in teaching and administrative positions, which did not adequately reflect the ethnic composition of the Waterbury student population.

---

[1] Waterbury Republican-American, May 1, 1999
[2] Exhibit 4.

1

HEARD 405

The newspaper also reported that the Superintendent of Schools was rarely consulted on teacher hires, and that Mayor Philip Giordano had appointed a longtime political ally, with little human resource experience, to serve as a "gatekeeper"[3] to school jobs. This "closed door" hiring system, where jobs were awarded to campaign contributors and relatives of city officials on a "who you know" basis, as opposed to proceeding through the usual civil service channels, was reported to have resulted in Waterbury having the lowest ratio of minority teachers of the five largest school districts in the state.[4]

Due to the serious nature of the allegations being raised by the Waterbury NAACP and the Waterbury Republican-American, the Commissioners of the CHRO voted to invite representatives of the City of Waterbury to attend a CHRO meeting to provide information about the issues.

On September 9, 1999, members of the Waterbury Board of Education (Mary White, James Murray), the Consultant to the Board (Louis Irvin) and the legal counsel to the city (Miguel Escalera, Esq.) appeared before the Commissioners. They discussed recruitment efforts that began in June of 1999 designed to attract more minority teachers and administrators to the city. Based on the information that was presented, the Commissioners found that the recruitment and outreach activities taken by the Board appeared to be comprehensive, and that the reported hiring results for minority teachers for the 1999/2000 school year appeared to be successful. The city representatives, however, were not able to provide sufficient assurances to the Commissioners that the activities as reported would be continued in the future.

Lacking the assurance that the city's recruitment efforts would continue long-term, the Commission formally voted to exercise its statutory authority, pursuant to CONN. GEN.

---

[3] Waterbury Republican-American, May 1, 1999
[4] Id.

2

HEARD 406

STAT. §4a-60, to begin monitoring the city's hiring practices. In September, 1999, the CHRO

sent a contract compliance monitoring report to the city to be returned by October 19, 1999.[5]

On October 13, 1999, the city confirmed, via letter to the CHRO, that it was granted an

extension until November 18, 1999, to provide this information.[6] On November 18, 1999,

however, the city notified the CHRO that it objected to the proposed monitoring system.[7]

In response to the city's refusal to file the contract compliance monitoring report, the

CHRO reviewed its enforcement options, including that of filing a Commission initiated

contract compliance complaint. Because of the serious nature of the issues being raised, and

the need to proceed expeditiously to resolve them, the CHRO voted on February 10, 2000, to

hold a fact-finding public hearing in the City of Waterbury on April 4, 2000, to gather facts

regarding the allegations made against the city.[8] On the basis of those findings the

Commission may "recommend policies and make recommendations to agencies and officers of

the state and local subdivisions of government"[9] to ensure equal employment opportunity in

the city. Representatives of the City of Waterbury, the State of Connecticut DOE, local

community groups and the public were invited to attend and give testimony concerning the

hiring practices of the Waterbury Board of Education. In all, 25 witnesses testified and over

150 exhibits were submitted to the CHRO. The information gathered by CHRO regarding

these matters, and recommendations based upon these facts, are presented in this report.

---

[5] Exhibit 68.
[6] Exhibit 69.
[7] Exhibit 70.
[8] See, CONN. GEN. STAT. §46a-56(a)(2); Regulations of Connecticut State Agencies §46a-54-16.
[9] See, CONN. GEN. STAT. §46a-54(7).

HEARD 407

## II.  EXECUTIVE SUMMARY

Teachers and administrators in the Waterbury school system have historically not been hired through an open and competitive process.  Many positions were generally filled without being advertised or open to the general public.  According to the city's own Board of Ethics, positions were primarily filled by applications on file or by word-of-mouth.  Occasionally, the mayor asked that one candidate be favored over another, and at times Board of Education members voted to hire friends or family members.  This lack of a formal hiring structure, whereby effective checks and balances could be enforced to diminish improper influence, gave the impression that teachers were hired and promoted on the basis of "who you know", and created a hiring procedure that failed to provide equal opportunity for all candidates.  The result, in part, was a very low representation of minorities among Waterbury's teaching and administrative staff.

In the early summer of 1999, the city hired an outside consultant to help recruit more minorities into those positions.  The consultant traveled to colleges with high minority enrollments, attended job recruitment fairs and helped the city advertise in media aimed at a minority audience.  The result of these efforts was that, for the 1999-2000 school year, nearly 50 percent of the administrators and 25 percent of the teachers hired were minorities.

Unfortunately, these hires did little to increase the <u>overall</u> representation of minorities in the Waterbury school system.  Further, 40 percent of the teachers hired in 1999 whose contracts were not renewed in 2000 were minorities, and two of four administrators who did not return were minorities.  The city also failed to implement follow-up steps recommended by the consultant to retain minority staff and to recruit minority staff for the school year beginning in September, 2000.  The consultant's contract was not renewed for the 2000-2001 school year.

HEARD 408

## III.  FINDINGS OF FACT

### A.    A Historical Overview

The City of Waterbury adopted an Affirmative Action Plan ("Plan") on May 8, 1978 to ensure equal employment opportunity in the city's recruitment and hiring procedures.[10]  On February 4, 1998, under Mayor Giordano, the plan was revised. There is some question, however, as to whether the mayor subsequently approved the plan on February 20, 1998,[11] because the mayor claimed his signature on the plan was a forgery.[12]  While the plan was ultimately approved by the city's Board of Alderman in February, 1998,[13] the fact that the mayor would deny ever having signed the plan calls into question his commitment to the Affirmative Action plan.

In addition to previous assurances of equal opportunity, the plan included several other key commitments and provisions, specifically:

- that the city would contact minority and women's groups for referral of qualified applicants,

- that appointments and promotions would be made solely on the basis of merit and fitness,

- that the city would keep a list of organizations that serve people with disabilities,

- that the city would advertise in minority-oriented newspapers, and in neighborhood centers frequented by minority groups and women, and

- that the city would mail job announcements to placement offices at colleges with predominantly minority and female students.[14]

---

[10] Exhibit 56.
[11] Id.
[12] Exhibit 152.
[13] Id.
[14] Exhibit 56.

HEARD 409

5

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

In summary, the mayor pledged to affirmatively seek to achieve the goals stated in the plan.[15]

The Connecticut General Assembly was concurrently developing legislation to improve the number of minority staff hired by boards of education statewide and to reduce racial, ethnic and economic isolation. As a result of recent legislation, local or regional boards of education are now required to "develop and implement a written plan for minority staff recruitment,"[16] with the goal of reducing "racial, ethnic and economic isolation."[17]

Hiring authority for the City of Waterbury school system is vested in the superintendent of schools, who has the authority to appoint, assign and dismiss principals, assistants and teachers.[18] Any appointment may be rejected by a majority vote of the Board of Education, and any dismissal is final unless reversed by a majority vote of the Board.[19]

In 1998, Waterbury employed the fewest number of minority teachers and administrators of the five largest school districts in the state (Hartford, Bridgeport, New Haven, Stamford, Waterbury). The following table was compiled from State Department of Education statistics. The data is based upon the 1998-1999 list of certified staff, dated October 1, 1998, provided by each city in their annual Strategic School Profile to the state Department of Education. The statistics considered blacks, Hispanics, Asian Americans and Native Americans as minorities.

---

[15] Id.
[16] CONN. GEN. STAT. §10-220a(a), effective July 1, 1998.
[17] CONN. GEN. STAT. §10-4a(3), effective July 1, 1997.
[18] See, Charter, City of Waterbury, Sec. 904.
[19] Id.

HEARD 410

WATERBURY TEACHERS AND ADMINISTRATORS, 1998

|  | Waterbury | Bridgeport | Hartford | New Haven | Stamford |
|---|---|---|---|---|---|
|  | % | % | % | % | % |
| Total White | 89.72 | 74.98 | 63.83 | 66.91 | 89.62 |
| Total Black | 3.68 | 14.8 | 18.2 | 22.8 | 6.8 |
| Total Hispanic | 6.27 | 9.3 | 17.0 | 9.3 | 2.6 |
| Total Asian American | 0.3 | 0.8 | 0.7 | 0.9 | 0.9 |
| Total Native American | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 |
| Total Minority | 10.28 | 25.02 | 36.17 | 33.09 | 10.38 |

The Board of Ethics of the city also investigated Waterbury's hiring procedures, including charges of improper closed door hiring practices, political patronage, nepotism and improper voting procedures.[20] The results of the investigation prompted the Board of Ethics to issue its own report, dated July 30, 1999, in which it found "several" Board of Education members were uninformed of the application process and the process by which applicants were accepted or rejected.[21] It also found:

> there was no formal structure established by the Board of Education, whereby effective checks and balances could be enforced to diminish improper influence into the hiring process by political pressure or other outside forces, from time to time. Teacher positions when available, were not posted or advertised, and were primarily filled by applications on file, or by word of mouth notification to resident friends, or through applications received over the transom.[22]

Further, the report stated, "It is apparent, that on occasion, the Mayor ... has asked that one candidate or another be favorably considered. There is no doubt that some level of

---

[20] Exhibit 13, p.1.
[21] Id.
[22] Id., p.2.

favoritism and political influence has come into play in every administration,"[23] and that the

Mayor "admitted to recommending an individual."[24] The Board of Ethics also found that

Board of Education member and the alleged "gatekeeper" to city teaching jobs, Frank

Lombardo, did, on occasion, seek advice from the Mayor on applications.[25]

The Board of Ethics also cited other Board of Education members for indiscretions.

Michael Andolina was cited for poor judgment for supporting the promotion of an individual

to Assistant House Principal whom he was dating at the time, and to whom he was engaged at

the time the Board of Ethics issued its report.[26] Rodney Parker voted to approve the hire of his

wife and his brother as teachers in Waterbury.[27] While he testified that he spoke to no other

Board of Education member when his wife applied for a job in 1996,[28] regulations governing

city employees specifically require members of municipal boards who have financial interests

in board decisions to disclose that interest.[29] Parker failed to do this. Finally, John Alseph,

another Board of Education member, testified that on two occasions he solicited his daughter

and sister to apply for teaching positions in Waterbury. He also stated, however, that he

disclosed the relationship to other Board of Education members.[30]

The Board of Ethics made several other relevant findings. The findings included:

> •The lack of a formal hiring process does lead to confusion
> and in turn, leaves the door open for potential influence by
> third parties. This lack of structure, along with the strong
> political atmosphere that had always existed in the City of
> Waterbury, has contributed to an overall impression that
> teachers are hired and promoted on the basis of WHO YOU
> KNOW.[31]

---

[23] Id., p.3.
[24] Id., p.5.
[25] Id., p.6.
[26] Id., p.7.
[27] Id., p.9.
[28] Id.
[29] Exhibit 146, *Conflicts of Interest*, §30.20, Interest in Contracts, Transactions and the Like to be Reported.
[30] Exhibit 13, p.10.
[31] Id., p.11.

HEARD 412

•The lack of structure ... created a hiring procedure that did not provide for a fair methodical process of Equal Employment Opportunity for all.[32]

•Affirmative Action Plans did not receive focused attention by this process, so that minorities of various origins were not sought, nor encouraged to apply.[33]

•The Board of Ethics is perplexed by the apparent lack of understanding of responsibility that existed within the membership of the Board of Education, whereby some members stated that they simply did not know that casting a vote to approve a relative's application was an act that can only be construed as a violation of their integrity and their oath of office.[34]

These findings of the Board of Ethics confirm that an atmosphere existed in which there was a degree of inappropriate influence in the hiring process of the Board of Education. Consequently, the process did not lend itself to equal opportunity, and an impression was created that teachers were hired based on "who you know." The ethics report found this inappropriate influence resulted in the neglect of the affirmative action plan, and ultimately resulted in the city failing to seek or encourage minorities to apply.[35]

State officials also raised concerns about Waterbury's hiring procedures. On August 11, 1999, Commissioner Sergi of the State DOE wrote to then Superintendent of Schools, Roger Damerow, stating that Waterbury's Affirmative Action Packet for the biennial period July 1, 1999 through June 30, 2001 was incomplete because it did not include the Minority Staff Recruitment and Retention Plan as required by Conn. Gen. Stat. § 10-220(a). Commissioner Sergi had previously advised Damerow, in a letter dated July 7, 1999, that for the packet to be complete, it must include a plan with procedures that:

---

[32] Id., p.12.
[33] Id.
[34] Id., p.13.
[35] Id., p.12

1) engage in an open, competitive, nondiscriminatory and well-defined process-with clearly defined roles for board members ... for seeking and hiring the most capable people;

2) develop and implement a _written_ plan for minority staff recruitment ... in addition to your citywide affirmative action plan;

3) require local school board members to abstain from voting on the appointment of family member-and excuse themselves entirely from the hiring process of the same.[36]

Although Commissioner Sergi requested a minority staff recruitment plan in July, it was not forwarded to him until November 5, 1999.[37]

Other city leaders, including the mayor, also acknowledged that the recruitment of minority teachers and administrators could have been better. Mayor Giordano, while claiming every minority who applied for a teaching position in Waterbury was hired, stated, "we realized our efforts in terms of recruiting minority teachers certainly could have been improved."[38]

In short, by the end of the summer of 1999, the City of Waterbury's Board of Ethics found certain members of the Board of Education engaged in inappropriate behavior that denied equal employment opportunity. Commissioner Sergi urged the city to open its hiring process and implement a written minority staff recruitment plan. City leaders, including the mayor, recognized the city's efforts in recruiting minorities were insufficient. Further, the local newspaper was closely watching and reporting on the city's recruitment and retention of minorities, and community groups such as the NAACP were presenting information before the CHRO about the negative impact the city's hiring procedures had on minority applicants and students.

---

[36] Id., p.13
[37] Exhibit 86.
[38] Transcript pp. 40, 45.

10                                                    HEARD 414

## B.    Recruitment and Hiring

### 1. History

Damerow, who was Waterbury's Superintendent from February 1, 1994 to February 1, 2000, had concerns about the city's hiring practices. He noted that there was never a systematic and professional hiring process for the education department.[39] He also noted there was no personnel office, little clerical support, no budget and no practice of advertising positions outside the district.[40] As a result, a Deloitte and Touche audit of the city in 1997 recommended that a personnel department be established and properly budgeted and staffed, which apparently never occurred.[41]

Damerow began to study other school districts hiring practices. He contacted and interviewed representatives from several other school systems, including Hartford, Bridgeport, New Haven, Stamford, New Britain, Danbury, Naugatuck and Torrington.[42] Damerow drafted findings, embodied in a June 3, 1999, report, detailing the hiring practices of the other districts.[43]

He found that each district, except for Torrington (the smallest), had either a Director of Personnel or a Director of Human Resources.[44] He also found the districts posted jobs internally and outside their area using local newspapers and minority publications, web sites, job fairs and college recruitment programs.[45] Except for Hartford, all other districts put

---

[39] Exhibit 151.
[40] Id.
[41] Id.
[42] Exhibit 90.
[43] Id.
[44] Id.
[45] Id.

HEARD 415

11

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

internal candidates in the same pool as external ones.[46]  Finally, other districts had recruiting

budgets that ranged from $15,000.00 to more than $100,000.00 per year.[47]

Damerow also examined how each district reviewed applications.  He found, "Each

district has a committee which screens and rates applications and candidates and creates

multiple ratings to reduce candidates to a high quality pool."[48]  After the review, ranked lists

are developed that are forwarded to the Personnel Director or the Superintendent.[49]  "In most

districts, except for hiring administrators, the Superintendent is not the key decision-maker.

The 'committee' of principals and supervisors and the Personnel Director really take the

lead."[50]  As a result of his findings, Damerow made several recommendations.  These included:

- creating a hiring practices advisory committee,

- creating an advertising budget of $25,000.00,

- filling the vacant Assistant Superintendent for Personnel position,

- soliciting temporary personnel assistance,

- establishing a final interviewing committee, and

- utilizing appropriately constructed questions and a uniform scoring plan during interviews.[51]

He noted that the creation of the advertising budget and the filling of the vacant personnel

position were underway.[52]

Although the city stated that it engaged in the recruitment of minority teachers from

1994 to 1998, it is noteworthy that Waterbury still employed the lowest percentage of minority

teachers and administrators of the five largest school districts in the state.  Also, according to

---

[46] Id.
[47] Id.
[48] Id.
[49] Id.
[50] Id.
[51] Id.
[52] Id.

12

HEARD 416

Damerow, the only time during his tenure any <u>active</u> external recruitment was carried out was the summer of 1999.[53]  Waterbury did increase its efforts beginning in May, 1999.  First, the Board of Education, at its May 3, 1999 meeting, resolved to establish a subcommittee to evaluate the procedures for hiring teachers and administrators.[54]  The subcommittee was charged with making recommendations to the Board of Education regarding hiring practices, affirmative action search procedures, active minority recruitment and staff/teacher development.[55]  This subcommittee had existed in the past,[56] but apparently needed to be revived.  This did not actually happen, however, until April 3, 2000, (the day before the CHRO held the public hearing in this matter).[57]  The inability of the city to establish and maintain this committee only serves to reinforce the notion that the city is not fully committed to improving its representation of minorities in its teacher and administrator ranks.

The city also began to retain personnel assistance.  Specifically, it retained Irvin & Associates, Educational Consultants, at a cost of $60,000.00 for a year, to help recruit minority teachers and administrators for city positions. Lou Irvin, Executive Officer of Irvin & Associates, began recruitment efforts for the city in June, 1999, and engaged in the majority of recruitment efforts on behalf of the city.

**2.    *Irvin's Recruitment and Hiring Efforts***

In June, 1999, Irvin proposed several short-term goals he anticipated completing within the first six months of the contract.  These included:

- establishing a goal of hiring a percentage of new hires from underrepresented groups,

---

[53] Exhibit 151.
[54] Exhibit 21.
[55] <u>Id.</u>
[56] Exhibit 1.
[57] Transcript, pp.98-99.

- attending local, state and national multicultural conferences and workshops,

- developing web sites and job hotlines and utilizing web sites of Historically Black Colleges and Universities (HBCU),

- establishing contacts with education majors at HBCU,

- establishing a racially and ethnically balanced recruitment and retention committee in Waterbury, and

- developing a marketing package for recruitment fairs and colleges and universities and career planning and placement centers.[58]

Irvin also identified several long-term goals to effectively recruit and retain a multicultural staff. These included, among others things:

- establishing Future Teacher Clubs, developing school-to-career programs with an emphasis on education,

- developing multicultural recruitment teams,

- sponsoring multicultural teacher fairs and open houses, and

- establishing links to the alternative certification process.[59]

Within his proposal, Irvin suggested immediately designing, developing and producing a recruitment package containing information about the Waterbury Public Schools, town services, housing, area-wide social activities and churches.[60] Further, Irvin proposed implementing a comprehensive hiring policy by forming and training multicultural recruitment teams to operate year round at colleges, rewriting interview protocols to ensure they were not ethnically biased, and developing more community contacts in civic, fraternal, professional and service organizations.[61]

---

[58] Exhibit 2.
[59] Id.
[60] Id.
[61] Id.

HEARD 418

Finally, Irvin made several recommendations regarding the retention of a diverse workforce, noting <u>the first year of employment has a "tremendous" effect on whether an employee decides to remain long-term.</u>[62] He stated he would assist the city by:

- scheduling periodic meetings and social activities for first year teachers,

- providing new hires with support networks and mentors,

- providing orientation programs for new hires,

- ensuring new hires are not placed in the position of being a resident expert on their cultural or ethnic heritage, and

- establishing networks to local, state and national multicultural education organizations.[63]

Irvin, or members of his consulting company, began the recruitment process almost immediately.  In July, 1999, they visited the Tuskegee Institute, acquiring over 20 resumes, and Alabama A & M University and Alabama State University, where they met with career development officers and placement services, and obtained over 60 resumes.[64]  They also traveled to Atlanta, visiting career development offices at Spellman College, Morris Brown University and Morehouse and Clark Atlanta University.[65]  Finally, from July 7 to 10, they attended the Leadership Training Institute for Educators, sponsored by the Ron Edmonds Leadership Institute in collaboration with the National Alliance of Black School Educators.[66]

Irvin and Associates also developed appropriate advertisements to help attract qualified minority candidates to the city.  Waterbury not only advertised teacher and administrator vacancies in local newspapers such as the <u>Waterbury Republican-American</u>, the <u>Hartford</u>

---

[62] <u>Id.</u>
[63] <u>Id.</u>
[64] <u>Id.</u>
[65] <u>Id.</u>
[66] <u>Id.</u>

### EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

Courant and the New Haven Register, but also advertised in publications such as El Diario, The Advocate and the Amsterdam News.[67]  As part of its outreach effort, Irvin and Associates also contacted at least 66 minority churches in Connecticut.[68]

Irvin and Associates pursued other goals by contacting administrators and union representatives from school districts in Connecticut and Massachusetts experiencing layoffs, requesting that they provide information about employment in Waterbury.[69]  Irvin and Associates met with Connecticut Alternative Route to Certification officials to review potential candidates, contacted teacher education colleges throughout New England and made plans to attend job fairs and career day programs.[70]

As a result of these efforts, 16 teacher candidates and three administrator candidates that Irvin and Associates recruited received employment offers from the city.[71]  Of those, ten teachers signed contracts and two administrators accepted positions within the city.[72]  Overall, eight out of 17 vice principals and house principals hired by Waterbury in 1999 were African-American or Hispanic, and 26 of 126 teachers hired were African-American, Hispanic or Asian.[73]

While these efforts to recruit and hire more minority candidates may be lauded, the following Department of Education statistics unfortunately show little change in the face of the teachers and administrators from 1998 to 1999.

---

[67] Exhibit 86.
[68] Exhibit 2.
[69] Id.
[70] Id.
[71] Id.
[72] Id.
[73] Exhibit 86.

HEARD 420

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

|  | Certified Teachers October, 1998 | Certified Teachers October 1999 | School Population October 1999 |
|---|---|---|---|
|  | % | % | % |
| Total White | 89.72 | 89.34 | 36.9 |
| Total Black | 3.68 | 3.79 | 25.7 |
| Total Hispanic | 6.27 | 5.85 | 35.6 |
| Total Asian American | 0.3 | 1.0 | 1.5 |
| Total Native American | 0.1 | 0.1 | 0.3 |
| Total Minority | 10.28 | 10.66 | 63.1 |

Overall, the 1999 hires only resulted in a .38 percent increase in minority representation. Further, according to the same statistics, 36.9 percent of Waterbury school children were white, 25.7 percent were African-American and 35.6 percent were Hispanic. These figures show that while the city took positive steps in an effort to increase minority representation among teachers and administrators, those efforts must be ongoing and the city must commit itself to a long-term plan.

Irvin and Associates did continue to try to recruit minority candidates. In November 1999, they attended and represented the Waterbury Public Schools at three national conferences, one in Tennessee and two in California.[74] Additionally, Irvin and Associates visited East Tennessee State University to recruit year 2000 graduates.[75]

While the conferences were expected to yield some candidates for both administrative and teaching positions, Irvin and Associates came away with a "sense of urgency" to define what the employment needs of the district were and to initiate strong recruitment efforts no

---

[74] Exhibit 2.
[75] Id.

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

later than January or February of 2000, for the 2000-2001 school year.[76] This would be in contrast to 1999 when recruitment was done during the summer months, just weeks before school was to start. This sense of urgency was noted because Waterbury was already behind other districts in terms of their recruiting efforts. For example, other districts had defined their projected vacancies and attended the meetings prepared to recruit for specific position openings.[77] Massachusetts was among several states offering signing bonuses and high dividends to teachers who gain National Professional Certification.[78] Waterbury, therefore, was at a distinct disadvantage when compared to these other districts that came prepared with specific openings and incentives.

Further efforts were made to recruit at traditionally African-American colleges, and in early March, 2000, Irvin and Associates visited several, including: Morgan State University, Hampton University, Virginia State University and South Carolina State University.[79] Many colleges throughout New England were also visited.

Irvin and Associates again expressed its frustration, however, because Waterbury was still lagging behind other districts in terms of preparation. Many had already targeted specific position needs, while Waterbury had not.[80] The result would be Irvin having to return to colleges later in spring to interview a diminished candidate pool. In addition to there being a shortage of bilingual teachers in the state, Irvin noted, "Minority candidates, especially administrators, are in high demand," but, "Other districts are getting the jump on the recruitment market."[81]

---

[76] Id.
[77] Id.
[78] Id.
[79] Id.
[80] Id.
[81] Id.

HEARD 422

Further, Waterbury did not provide a recruitment brochure to Irvin, the lack of which was perceived as a "decided disadvantage" at campus recruitment visits by Irvin.[82]  Irvin noted it could have created a mock-up brochure, but that as of March 31, 2000, it had not been authorized to proceed, nor was there any evidence that the Waterbury public relations staff had been directed to produce one.[83]  Further, Irvin stated no budget authorization for internal or external preparation and printing of recruitment material, again as of March 31, 2000, had been made.[84]  (On May 3, 2000, the CHRO received a recruitment brochure from the city.)[85]

On March 31, 2000, Irvin and Associates made several additional recommendations to the city, including: meeting with Irvin on a regular basis to improve communications, providing immediate access to the entire list of known professional vacancies for the 2000-2001 year, and preparing recruitment brochures.[86]  Irvin also asked the city to determine whether anyone would attend upcoming education conferences in Florida, New York, Indiana, Georgia and Illinois.[87]

Other recommendations by Irvin included: meeting the commitment to advertise in non-traditional and minority publications, identifying recruitment and retention teams from within current Waterbury staff and conducting diversity training workshops for all staff.[88]  By the end of March, 2000, Irvin believed the city needed to do more to ensure the gains made the previous summer in hiring were continued.

---

[82] Id.
[83] Id.
[84] Id.
[85] Exhibit 101.
[86] Exhibit 2.
[87] Id.
[88] Id.

## C.    *Retention*

As previously stated, according to State Department of Education statistics, the number of minority teachers and administrators in Waterbury grew by only approximately one-half of one percent between 1998 and 1999. Therefore, it was imperative for the city to retain as many of the new qualified minority recruits as possible to avoid regressing in terms of these overall employment figures.

Determinations in Waterbury as to whether a teacher's contract will be renewed lies with the Waterbury Board of Education. Unless the Board of Education decides not to renew a non-tenured teacher contract prior to April 1, it is automatically renewed.[89] Sixteen teachers were recommended for non-renewal in April, 2000.[90] Of those, ten were hired in 1999.[91] Of those ten, four were minority hires.[92]

Further, of four new principals hired, one minority (Sharon Heard-McKnight) resigned and another minority (Frances Tilghman) did not have her contract renewed.[93] In a letter to the CHRO, Heard-McKnight described the extraordinary difficulty she faced when hired two days before teachers were to report to Wallace Middle School where she had been assigned. The interim principal (who applied for her job but did not get it) took personal time off.[94] Schedules were not completed, the school was short six teachers, teacher packets were not prepared, there was no full-time secretary, there was no detention or in-school suspension policy, there was no security, other support staff (one guidance counselor, one social worker) were insufficient for the number of students (1,200) and there was no bilingual secretary in the

---

[89] Transcript, p. 81.
[90] Exhibit 138.
[91] Id.
[92] Id.
[93] Exhibit 141; Transcript, p. 82.
[94] Exhibit 88.

HEARD 424

school that had a Latino population of 33 percent.[95]  Despite these obstacles, Heard-McKnight

was given a positive review by Damerow before he left Waterbury in January, 2000.[96]

At the beginning of 2000, Matthew Borelli was hired to replace Damerow on an

interim basis as superintendent. Borelli described a standard that he expected everyone below

the level of superintendent to meet, "performing at a level of excellence or demonstrating the

potential for excellence."[97]  He also described an evaluation process with four components, as

they relate to principals: self-evaluation, his evaluation, teacher evaluations and PTA

evaluations.[98]  To complete his evaluation, Borelli stated he would get out, hear, work and

listen, to get a personal perspective.[99]  According to Borelli, any teacher or principal not

meeting that standard would not have their contract renewed.[100]  It was Borelli who decided

Tilghman's contract should not be renewed, and about whom Heard-McKnight raised some

disturbing allegations.

Both Heard-McKnight and Tilghman objected to Borelli's overall evaluations of them.

First, they objected to his reliance on the Parent Teacher Association (PTA) to evaluate them.

Heard-McKnight questioned how Borelli could rely on a PTA that only met her a few times.[101]

She also alleged Borelli cancelled a meeting he scheduled between herself, Borelli and the

PTA, and then told Heard-McKnight that he did not want her at the meeting, so she did not

attend.[102]  She stated that she heard the meeting was akin to a "lynch mob."[103]

---

[95] Id.
[96] Id.
[97] Transcript, p. 82.
[98] Transcript, p. 89.
[99] Transcript, p. 92.
[100] Transcript, p. 85.
[101] Id.
[102] Exhibit 88.
[103] Id.