EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

Tilghman and Heard-McKnight also objected because Borelli, contrary to his own evaluation standards ("I get out. I hear. I work. I listen."[104]), did not spend adequate time with them. Heard-McKnight alleged she had a personal meeting scheduled with Borelli to discuss her evaluation, he cancelled, and rescheduled without sufficient time for her teachers to do their evaluations of her, thereby not having the benefit of their input, and failing to "listen".[105] She also stated he called her into meetings without letting her know in advance the subject of the meeting, resulting in her being unprepared, he failed to adequately consider Damerow's evaluation and he disregarded the conditions under which she had to start.[106] Instead of suffering further, she resigned to protect her career.[107]

Tilghman had more direct problems with Borelli's use of the PTA as an evaluator. The PTA at her school (Bunker Hill School) organized a petition specifically asking the Board of Education not to renew her contract.[108] While the petition was signed by several dozen people, Tilghman received favorable support from many Waterbury residents who attended a Board of Education meeting in March, 2000, prior to the decision to not renew her contract.[109]

Tilghman also stated that, despite Borelli's indications he would get out to spend more time in the schools, he only visited her school once and did not share any parameters of an evaluation process with her. Borelli also did not adequately consider Damerow's favorable evaluation of Tilghman, even though Damerow had four months to evaluate her performance while Borelli had only two. And when it came time to renew her contract, Borelli, not having followed his own evaluation criteria, and having failed to consider the prior evaluations, placed her on administrative leave.[110]

---

[104] Transcript, p. 88.
[105] Exhibit 88.
[106] Id.
[107] Id.
[108] Exhibit 116.
[109] Exhibit 79.
[110] Transcript, p. 217, 223.

22

HEARD 426

The testimony of Tilghman and the statements provided by Heard-McKnight indicate Borelli did not follow his own evaluation criteria. As previously stated, Borelli described an evaluation process whereby he considered four components: self-evaluation, his evaluation, teacher's evaluations and PTA evaluations. He further described a range of ways by which he may communicate with someone he was evaluating. He may speak on the telephone, he may visit the school, he may talk to teachers and the PTA.[111] Based on the testimony, it appears there was very little interaction between Borelli and either Heard-McKnight or Tilghman. To the contrary, there were cancelled meetings, few, if any, visits to the schools, and little teacher input.

Further, several newly hired minority staff members decided to leave the Waterbury system in June of 2000.[112] After Borelli was hired the communication process between the city and Irvin appeared to diminish. Specifically, Irvin was not involved in the search for an individual to fill the Director of Technology position; Irvin only learned of the search from seeing a publication in the Hartford Courant and Waterbury newspaper, rather than through the prior practice of face-to-face meetings.[113] Irvin blamed this lack of communication on "changes within the district's central administration and lack of access to the Interim Superintendent."[114] Irvin suggested the prior practice of direct communication would enable him to quickly respond to the city's needs.[115]

The CHRO is obviously concerned by the city's inability to retain minority hires, as 40 percent of the new teacher hires not renewed were minority and two of four new principal hires, also minority, either quit or were not renewed. Also, the lack of communication Irvin

---

[111] Transcript, p. 96.
[112] Exhibit 2.
[113] Id.
[114] Id.
[115] Id.

described with city officials, along with the city's failure to implement some of his suggestions,

leads the CHRO to question the city's commitment to long-term recruitment and retention of

minority teachers and administrators.  There could be a direct correlation between the city's

failure to properly implement its minority recruitment retention plan (no effective human

resource staff, no periodic meetings for first year teachers, inadequate orientation for new

hires) and the loss of several new minority hires. While the mayor expressed his support for a

five-year plan suggested by Irvin,[116] he also indicated there were no plans to renew Irvin's

contract for the 2000-2001 school year.[117]  The city's failure to renew Irvin's contract casts

doubt over its commitment to continue the recruitment efforts he began.

---

[116] Transcript, p. 46.
[117] Transcript, pp. 54-55.

HEARD 428

# III.  **RECOMMENDATIONS**

The CHRO makes the following recommendations to the Governor, the General Assembly and the City of Waterbury as part of a long-term effort to address the shortcomings in Waterbury's efforts to recruit and retain minority teachers and administrators.  There are three recommendations for the General Assembly and seven recommendations for the city.

## A.    *Recommendations to the General Assembly*

### 1.  *Strengthen the Duties of Boards of Education, CONN. GEN. STAT. §10-220(a)*

CONN. GEN. STAT. §10-220(a) requires each local and regional board of education to develop and implement a written minority recruitment plan to further the state's interest in reducing racial, ethnic and economic isolation in public schools.  The CHRO recommends the Department of Education:

1) ensure the required plan is properly received from each local and regional board of education,

2) review the implementation by each local and regional board of education of their submitted plan, and

3) submit an annual report to the General Assembly about the status and results achieved by each local and regional board of education to effectuate the intent of CONN. GEN. STAT. §10-220(a).

Further, the CHRO recommends that the Department of Education be granted authority to withhold funding from school districts not acting in good faith to comply with § 10-220(a).  Specifically, if a local or regional board of education fails to develop and implement a written minority recruitment plan, the Connecticut Department of Education may recommend, and the

25

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

Secretary of the Office of Policy and Management may order, an appropriate penalty in the form of withholding of state funds from the local or regional board of education.[118]

### 2. Amend "An Act Concerning Education Aid", Public Act 00-187 Section 27

This act, effective July 1, 2000, establishes a Commission to address the Teacher and School Administrator Shortage and Minority Recruitment. That commission is charged with several responsibilities including: exploring various incentives and alternatives as to how teachers and administrators receive credentials, and attracting and retaining minorities in those positions. By the terms of the Act, the commission shall terminate not later than January 1, 2001. The CHRO recommends this statute be amended to continue the existence of the commission beyond January 1, 2001. As part of its ongoing responsibilities, this commission could engage in continuous oversight to ensure recommendations it makes are fully implemented.

### 3. Emphasize Recruitment and Retention of Minority Staff

a) In September, 1995, the Connecticut Advisory Council for Teacher Professional Standards submitted "A Proposal to Increase the Number of Minority Educators in Connecticut" to the Governor, the State Board of Education and the Education Committee of the General Assembly of the State of Connecticut. Although five years old, the proposal includes many worthwhile recommendations, some of which are now adopted by the CHRO. They include:

- increasing primary assistance to local school districts,

- academic intervention and pre-collegiate programs in the early grades to attract students to teaching as a career, including peer tutoring, mentoring, courses on careers in teaching and effective guidance services,

---

[118] Similar language can be found in P.A. 99-198, "An Act Concerning Traffic Stops Statistics".

- college and university involvement,
  including recruitment of minority high school
  students into teacher training, scholarship and
  loan forgiveness to graduates who teach,
  expanding the Alternate Route to Certification
  program and giving incentives for teacher aides
  and other professionals to become teachers,

- other state support, including promotion,
  through policies, practices and procedures, of
  diversity, greater distribution of information
  to the public and development of alternative
  teacher assessment methods.

b) The State Department of Education submitted a study entitled "Public School

Educator Supply and Demand in Connecticut: A Look Toward the 21st Century" to the

CHRO.[119]  Within that report are numerous recommendations regarding recruitment and

retention of minority staff, which the CHRO now supports.  They include:

- publicizing loan forgiveness programs or grants,

- redesigning the "Teaching Opportunities for
  Paraprofessionals" program to encourage
  minorities to pursue teaching careers,

- creating year-long, evenings and weekends
  alternate route to certification programs with
  priority for minority applicants,

- encouraging and staffing regionally coordinated
  recruiting in New York, Boston and nationwide at
  historically black colleges and colleges with
  large Spanish-speaking student populations, and

- convening Connecticut colleges and universities,
  through the Department of Higher Education, to
  discuss on-campus activities to stimulate
  interest of minority students in teaching.[120]

---

[119] Exhibit 91.
[120] Id.

EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

## B.    Recommendations to the City of Waterbury

### 1.    The city should submit a long-term five year plan to the CHRO and annually report to the CHRO

The CHRO recommends the City of Waterbury submit a long-term five year plan to the CHRO regarding what steps it plans to take to ensure adequate recruitment and retention of minority teachers and administrators.  Mayor Giordano supports the establishment of such a plan; "I would agree with Mr. Irvin that at least a five-year plan ought to be implemented with a basis for review of that plan."[121]  The CHRO concurs with the mayor's suggestion, and recommends such a plan is developed and submitted to the CHRO, and that the CHRO review and evaluate the implementation of such a plan on an annual basis.

Further, it is recommended the city submit monthly reports to the CHRO outlining who has been hired, and the process used for those hires, and outlining budgetary issues such as amount spent on recruitment, hiring and retention, and personnel.  The CHRO also recommends the city appear before the agency on a semi-annual basis to review and respond to inquiries based on those reports.

### 2.    Eliminate the mayor as an ex-officio member of the Board of Education

Pursuant to section 2101 of the Charter of the City of Waterbury, the mayor shall be "chairman, ex-officio, as hereinafter defined, of all ... boards or commissions or authorities, except the board of tax review, the board of zoning appeals, the civil service commission or any other board whose sole duties are those of reviewing or appeal."[122]

The CHRO recommends the Board of Education be added to the list of exceptions of boards to which the mayor is an ex-officio member.  Removal of the mayor from such a

---

[121]Transcript, p. 46.
[122] Exhibit 147.

HEARD 432

position eliminates the appearance of impropriety or undue influence in decisions pertaining to the hiring or retention of school staff.

### 3. *Implement the minority staff recruitment plan and utilize the minority recruitment committee*

The city delayed its development of a minority recruitment plan. It took the city four months to respond to Commissioner Sergi's letter of July 7, 1999, specifically asking the city to develop such a plan. Now that it is in place, the CHRO recommends that the city implement the provisions therein, many of which were also a part of several recommendations made by Irvin. They include:

> 1) ensuring the committee for recruitment and retention of minority staff continues to exist (said committee has existed on and off for several years, and was most recently reorganized the day before the CHRO held the public hearing on this matter in Waterbury),
>
> 2) widely advertising vacancies in local and regional newspapers and radio stations,
>
> 3) continued recruiting at colleges that graduate significant numbers of black, Hispanic and other minority students,
>
> 4) supporting future teacher clubs within the city to encourage local students to develop an interest in teaching as a career,
>
> 5) continued recruiting at local, state and national multicultural conferences, workshops and job fairs,
>
> 6) designing, developing and producing a recruitment folder to include information about Waterbury schools, town services, housing, area activities, churches, community organizations, and the like,
>
> 7) budgeting annually for recruitment purposes,
>
> 8) revising and rewriting interview and hiring protocols to ensure the hiring process is more systematic and not biased,
>
> 9) establishing a human resource department with adequate personnel,
>
> 10) scheduling periodic meeting and social activities for first year teachers,

11) properly maintaining interview documents and records,

12) developing a uniform scoring plan for interviews,

13) providing new teachers with support networks and mentors in addition to those required by the state,

14) establishing a final interview committee,

15) establishing a recruitment and retention team from current staff,

16) compiling a known list of vacancies, and actively seeking replacements, immediately upon knowledge of said vacancy,

17) budgeting for relocation assistance and sign-on bonuses,

18) developing a network of host families for prospective hires,

19) providing an orientation program for new hires,

20) continued use of consultants to assist in minority recruitment and retention, and

21) continued monitoring of the minority applicant flow, and retention of minority candidates.

## 4. *The Board of Education should be trained on an annual basis regarding potential conflicts of interest*

The city's own Board of Ethics was "perplexed" by the lack of understanding several

Board of Education members had regarding their responsibility to avoid any appearance of

favoritism.[123] The Board of Ethics made several recommendations, which the CHRO adopts.

They include:

- requiring Board of Education members to abstain from voting on issues relating to family members or friends, or issues that may give the appearance of impropriety, and

- requiring Board of Education members to reacquaint themselves with Article 9, §§167 and 168 of the city charter, dealing with violations of the ethics code.

---

[123] Exhibit 13.

HEARD 434

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

The CHRO also makes the following recommendations:

- Board of Education members be given annual training regarding the ethical issues raised by the Board of Ethics,

- all public officials, not just those on the Board of Education, be notified that they should not serve as a "gatekeeper" between an applicant and the central office. All applicants should be told to forward their applications directly to the central office to avoid the appearance of any improper involvement by a city official.

### 5. *Reestablish the local Human Rights Commission*

The CHRO recommends the city reestablish the Human Rights Commission as a viable and effective body, with staff support and a working budget, and charge it with the responsibility to oversee and monitor:

1) the implementation of the city Affirmative Action Plan for general government

2) the Board of Education Minority Staff Recruitment and Retention Plan.

In addition, that Commission should issue annual public reports about the implementation status of each plan.

### 6. *Revision of Affirmative Action Plan*

The City of Waterbury Affirmative Action Plan ought to be revised to include:

1) realistic and achievable affirmative action employment and contracting goals

2) designating responsibility and accountability for implementation to a designated city official, and

3) delegating monitoring and public reporting responsibility to the Waterbury Human Rights Commission.

### 7. *Establish a Personnel Department primarily responsible for staffing Education Positions*

The City of Waterbury should establish a separate personnel department for the purpose of providing human resource staff support related to recruiting, hiring, promoting, and

EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

retaining teachers and administrators within the city.  The CHRO recommends that the

department implement Damerow's recommendations including: creating a hiring practices

advisory committee and final interview committee, utilizing uniform questions and scoring

procedures and soliciting personnel assistance.  Further, the creation of an advertising budget

and hiring of an Assistant Superintendent for personnel should be completed, if not done so

already.

    Recruitment, interviewing, hiring and retention of teachers should be handled primarily

by this department, under the general supervision of the Superintendent pursuant to city

charter.  The Board of Education should continue to have input as to hiring of administrators.

HEARD 436

## IV.   <u>CONCLUSION</u>

In the past, the City of Waterbury utilized a hiring system for teachers and administrators that lacked adequate safeguards to prevent, at the very least, the appearance of favoritism and, at worst, decisions that led to drastic under-representation of minorities in those positions. Board of Education members voted for family members or friends, openings were not properly advertised and the city made little effort to attract and retain qualified minority educators. The result was a workforce of teachers and administrators that was not representative of the students in the city.

The city made an effort in late spring of 1999 by hiring Irvin and Associates to help recruit, hire and retain minority staff. While the actual number of those hired appears to show Waterbury was headed toward a more diverse workforce, Department of Education figures show only a slight change in the racial and ethnic makeup of teachers and administrators.

Further, those efforts did not appear to continue into 2000, as the city failed to undertake the additional steps needed to ensure recruitment and retention would be an ongoing priority. The city did not define its employment needs early in the recruitment process, thereby falling behind other districts. A recruitment brochure was not timely developed. The contract of Irvin and Associates was not renewed, there is still no personnel department, and the city allocated no money for recruitment.

On July 17, 2000, the CHRO sought updated facts from Waterbury regarding the city's hiring practices, to be provided by July 31, 2000.[124] The response, submitted August 11, 2000, included minimal helpful information. For example, the CHRO asked what money had been budgeted for recruitment and retention of minority teachers and administrators for 2000-

---

[124] <u>See</u> appendix, letter from Cynthia Watts Elder to Miguel Escalera, Jr., dated July 17, 2000.

HEARD 437

2001.[125]  The city responded by stating the budget included funding, but did not specify how much or towards what the proposed money would be spent.[126]  The response further confirmed the city is not currently using outside contractors for recruitment purposes (Irvin & Associates was not rehired) and that the Board of Alderman rejected an amendment to the city charter that would have removed the mayor as an ex-officio member of the Board of Education.[127]  The CHRO has recommended against these two actions in this report.

Further, the CHRO asked for specifics regarding the racial, ethnic and gender composition of new teachers/administrators hired.[128]  The city responded by stating its final hiring numbers would not be available for another month.[129]  As of the date of this report, those numbers have not been submitted.

Finally, the CHRO sought information regarding the Standing Committee for Recruitment and Retention of Minority Teachers and Administrators.[130]  The city responded by stating the committee had "many meetings" and "made significant progress in advancing minority recruitment efforts."[131]  The CHRO questions this assertion, however, as one of its own employees has participated on that committee in the past, but is currently unaware of any recent activities involving that committee.[132]  In addition, upon review by the CHRO, a member listed on the committee's roster was found to be deceased.

Therefore, the CHRO has made numerous recommendations to the Governor, the General Assembly and the city in an effort to ensure minorities are properly represented in Waterbury's teaching and administrative ranks.  Failure to implement these recommendations,

---

[125] Id.
[126] See appendix, letter from Miguel Escalera, Jr. to Cynthia Watts Elder, dated August 11, 2000.
[127] Id.
[128] See appendix, letter dated July 17, 2000.
[129] See appendix, letter dated August 11, 2000.
[130] See appendix, letter dated July 17, 2000. [130]
[131] See appendix, letter dated August 1, 2000.
[132] See appendix, letter from Cynthia Watts Elder to Miguel Escalera, Jr., dated August 18, 2000.

HEARD 438

the CHRO predicts, will result in a return to the "closed door" hiring system that prevented
qualified minority candidates from attaining teaching and administrative positions within the
city.

# VI    Selected Testimony

The following are excerpts from testimony of some of the 25 witnesses who
presented testimony to the CHRO at the fact-finding hearing in the City of Waterbury on
April 4, 2000.

### From James Griffin, NAACP Waterbury Chapter President

"What we find is that there (are) no role models in our school system. When you
walk into a school, some schools you could walk into and you'll not see one black
or Hispanic teacher. And this is 19-what? 2000."

"The bottom line is our children are suffering. No one has come before us and
talked about the test scores of our children. No one has talked about how the
retention rate of our children is, the drop out rate of our children, the lack of
educational opportunity. Nobody's talking about that. All they're talking about is
who is getting hired, who is getting fired. And as a result, the kids are suffering."

### From David Burgos, member of the Waterbury Board of Education

"We need to be more aggressive and assertive in hiring more minority teachers and
administrators into the system. We ... need to make the financial commitment to
advertise for minority teachers and administrators. We committed to one last year.
This year—and now we're working on our budget for next year. And I know that
this commitment will be permanent. Not a one-year plan, not a two-year plan or a
five-year plan, but permanent."

### From John Sarlo, Waterbury resident

"I honestly believe that this administration denied my son the opportunity at an
opportune time when he was duly qualified to be a teacher because of political
implications of the administration that presently exists in the City of Waterbury."

EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

### From Frances Tilghman, former principal, Bunker Hill School

"I'm working in a school system where when I started, we had a population of 575 children. I work in a building that is 96 years old. I have no resources. I have two behavior disorder classrooms, but no certified Special Education teacher, no time out room, no secretary from September until two weeks ago."

"A meeting was held with the PTA. It was told to me that the problem with me was the color of my skin, the type of car I drove. Who did I think I was? This is their school and they did not want me there. They did not deny this."

### Frances Tilghman, in response to a question from then CHRO Commissioner Roger Vann,

Q-"Would you recommend that (fellow African American principals) file for a job here in Waterbury right now?"

A-"No, I would not. Not in Waterbury."

### From Larry Butler, member of the Waterbury Board of Alderman

"This is a very political city. I can't emphasize it enough."

### From Caplina Ray, Waterbury resident

"We're almost coming at a point where you've got almost a black and white issue going on in this city. There's a lot of racial tension going on. The city is clearly divided."

### From John Alseph, former member of the Waterbury Board of Education

"There is no doubt there's problems. We do need to do better. But you know what? The four years I've been here, I am not—and I never once received a phone call from anybody of a minority persuasion saying that they did not get interviewed, that they did not get hired, that they were not treated fairly."

### From Debbie Forte, Waterbury resident

"The first item in this matter is how the Bunker Hill PTA displayed racial negativity towards Mrs. Tilghman's position as an administrator of the school. The PTA has taken up a more vigilante approach of preventing African-Americans and Hispanic-Americans from being involved with their children."

HEARD 440

## EMPLOYMENT PRACTICES IN THE WATERBURY SCHOOL DISTRICT

### From David Gilmore, Waterbury resident

"What we have here in Waterbury——and I don't believe that there's a lot of—a lot of the folks that are involved in this scenario are racists themselves, but the system is systematically and institutionally promoting racist attitudes."

### From Mark Wrenn, former member of the Waterbury Board of Education

"If you're going to eliminate the mayor as an ex-officio member of the Board (of education), you should also allow the Board of Education's budget go directly to the Board of Alderman and not to a mayor-appointed board (Finance) because, as we all know, if you control the purse strings, you can control the activities of a particular board."

# List of Exhibits

HEARD 442

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

# LIST OF EXHIBITS

EXHIBIT 1     Memorandum dated April 4, 2000 from Thelma Williams, Former Board of Education
              Commissioner

EXHIBIT 2     Memorandum dated June 15, 1999 from Irvin and Associates to Dr. Roger A. Damerow

EXHIBIT 3     Letter dated November 5, 1999 from Roger A. Damerow to Commissioner Theodore S. Sergi

EXHIBIT 4     "The Plight of Black Teachers in Waterbury Public School System 1975-1976 and 1997-1998"

EXHIBIT 5     Letter dated January 14, 2000 from James B. Mullen, Jr. to Mayor Philip Giordano

EXHIBIT 6     Memorandum to Mr. Michael Andolina, President, Board of Education, from Paul V. Sequeira,
              Assistant Superintendent for Curriculum & Instruction

EXHIBIT 7     Newspaper article dated Saturday, March 25, 2000, Waterbury Republican-American

EXHIBIT 8     Newspaper article dated Tuesday, March 28, 2000, Waterbury Republican-American

EXHIBIT 9     Promotion Exam Announcements used for promotional exams

EXHIBIT 10    1999-2003 Agreement Between the School Administrators of Waterbury and the Waterbury Board
              of Education

EXHIBIT 11    1999-20003 Written Agreement Between the Waterbury Board of Education and the Waterbury
              Teachers' Association

EXHIBIT 12    Document dated August 31, 1999 from Ronald E. Brodeur, Retired Chairman, Board of Ethics,
              City of Waterbury, concerning Phase I Report on Special Hearing Related to Conflict of Interest
              Charges Alleged against Member of the Board of Education

EXHIBIT 13    City of Waterbury, Board of Ethics document dated July 28, 1999 concerning Special Fact
              Finding Hearing related to the Board of Education

EXHIBIT 14    Members of the Waterbury Board of Education

EXHIBIT 15    Walsh Technology Magnet School PTA WISHLIST

EXHIBIT 16    Memorandum to the State Board of Education, Waterbury Board of Education, NAACP and State
              Commission on Human Rights and Opportunities from Debbie Forte regarding 2-5 day
              administrative leave of Principal Frances Tilghman

EXHIBIT 17    Letter dated April 7, 2000 from Lynn LaForme, Kathie Schock and Diane Sprano to CHRO
              Executive Director

EXHIBIT 18    Correspondence dated April 5, 2000 from Dennis W. Byars and Arline M. Stephenson to
              Philip Murphy

**HEARD 443**

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 2

EXHIBIT 19     Letter dated April 6, 2000 from Matthew J. Larkin, President, School Administrators of
Waterbury, to Philip Murphy

EXHIBIT 20     Letter dated April 7, 2000 from Jan Calabro to Philip Murphy

EXHIBIT 21     Waterbury Board of Education Minutes – January 1999 – June 1999 (diskette)

EXHIBIT 22     Waterbury Board of Education Minutes – January 1998 – August 1998 (diskette)

EXHIBIT 23     Waterbury Board of Education Minutes – August 1998 – December 1999 (diskette)

EXHIBIT 24     Waterbury Board of Education Minutes – July 1999 – December 1999 (diskette)

EXHIBIT 25     Waterbury Board of Education Minutes – January 2000 – March 2000 (diskette)

EXHIBIT 26     Memorandum dated November 26, 1999 from Robert Babcock to Ron Fletcher regarding
Waterbury Minority Recruitment and Retention Plan

EXHIBIT 27     Memorandum dated June 4, 1999 from Commissioner Theodore S. Sergi to Superintendent of
Schools, Executive Directors of RESCs, Bidders, Grantees and Contractors regarding Affirmative
Action Packet and Standard Statement of Assurances:  Contracts and Grants for Fiscal Year 1999-
2001

EXHIBIT 28     Waterbury's Efforts in 1999 to Achieve a High-Quality and Diverse Workforce

EXHIBIT 29     Memorandum dated June 15, 1999 from Robert Babcock to Ron Fletcher regarding Discretionary/
Competitive Grants

EXHIBIT 30     Letter dated July 7, 1999 from Commissioner Theodore S. Sergi to CHRO Executive Director

EXHIBIT 31     Connecticut Commission on Human Rights and Opportunities Workforce Analysis – Norwich
Public Schools

EXHIBIT 32     Strategic School Profile 1998-99 – West Haven School District

EXHIBIT 33     Strategic School Profile 1998-99 – East Hartford School District

EXHIBIT 34     Strategic School Profile 1998-99 – Bloomfield School District

EXHIBIT 35     Strategic School Profile 1998-99 – Windham School District

EXHIBIT 36     Strategic School Profile 1998-99 – Stamford School District

EXHIBIT 37     Strategic School Profile 1998-99 – Norwalk School District

EXHIBIT 38     Strategic School Profile 1998-99 – New London School District

EXHIBIT 39     Strategic School Profile 1998-99 – New Britain School District

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 3

| | |
|---|---|
| EXHIBIT 40 | Strategic School Profile 1998-99 – Middletown School District |
| EXHIBIT 41 | Strategic School Profile 1998-99 – Meriden School District |
| EXHIBIT 42 | Strategic School Profile 1998-99 – Hartford School District |
| EXHIBIT 43 | Strategic School Profile 1998-99 – Danbury School District |
| EXHIBIT 44 | Strategic School Profile 1998-99 – Bristol School District |
| EXHIBIT 45 | Strategic School Profile 1998-99 – Bridgeport School District |
| EXHIBIT 46 | Strategic School Profile 1998-99 – Waterbury School District |
| EXHIBIT 47 | Strategic School Profile 1998-99 – Waterbury School District |
| EXHIBIT 48 | Strategic School Profile 1998-99 – New Haven School District |
| EXHIBIT 49 | Profiles of our Schools – Condition of Education in Connecticut Connecticut Board of Education 1997-98 |
| EXHIBIT 50 | Connecticut Mastery Test Statewide Test Results, School Year 1999-2000 Grade 4 |
| EXHIBIT 51 | Connecticut Mastery Test Statewide Test Results, School Year 1999-2000 Grade 6 |
| EXHIBIT 52 | Connecticut Mastery Test Statewide Test Results, School Year 1999-2000 Grade 8 |
| EXHIBIT 53 | Document dated June 14, 1999 from Roger Damerow to the Waterbury Board of Education regarding the temporary hire of Howard Rosenstein as Acting Assistant Superintendent of Personnel |
| EXHIBIT 54 | Contract for Recruitment Consultation Services |
| EXHIBIT 55 | City of Waterbury Fact-Finding – Commission on Human Rights and Opportunities' Areas of Inquiry |
| EXHIBIT 56 | Letter dated September 7, 1999 from Robert Babcock to CHRO Executive Director |
| EXHIBIT 57 | Signed Document dated August 31, 1999 from Ronald E. Brodeur, Retired Chairman, Board of Ethics, City of Waterbury, concerning Phase I Report on Special Hearing Related to Conflict of Interest Charges Alleged against Member of the Board of Education |
| EXHIBIT 58 | Board of Ethics Regular Meeting, Tuesday, January 11, 2000 |

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 4

EXHIBIT 59    Memorandum dated January 7, 2000 from Philip Murphy to CHRO Commissioners regarding City of Waterbury, Board of Education

EXHIBIT 60    Letter dated May 13, 1999 from CHRO Executive Director to Commissioner Theodore Sergi

EXHIBIT 61    Letter dated May 28, 1999 from James L. Griffin, President, Waterbury NAACP, to Commissioner Theodore Sergi

EXHIBIT 62    Letter dated June 25, 1999 from CHRO Executive Director to Commissioner Theodore Sergi

EXHIBIT 63    Letter dated July 7, 199 from Commissioner Theodore Sergi to CHRO Executive Director

EXHIBIT 64    Letter dated July 16, 1999 from CHRO Executive Director to Roger Damerow, Superintendent of Schools, City of Waterbury

EXHIBIT 65    Letter dated August 11, 1999 from Commissioner Theodore Sergi to Roger Damerow

EXHIBIT 66    Letter dated August 24, 1999 from Attorney Miguel Escalera to CHRO Executive Director regarding hiring of minority teachers and administrators in Waterbury

EXHIBIT 67    Letter dated August 30, 1999 from CHRO Executive Director to Attorney Miguel Escalera regarding hiring of minority teachers and administrators in Waterbury

EXHIBIT 68    Letter dated September 16, 1999 from CHRO Executive Director to Mayor Philip Giordano

EXHIBIT 69    Letter dated October 13, 1999 from Attorney Miguel Escalera to CHRO Executive Director regarding bidder contract compliance monitoring

EXHIBIT 70    Letter dated November 18, 1999 from Attorney Miguel Escalera to CHRO Executive Director regarding bidder contract compliance monitoring

EXHIBIT 71    Letter dated November 23, 1999 from James Griffin to CHRO Executive Director

EXHIBIT 72    Memorandum dated December 23, 1999 from David Gilmore, President, Coalition for Better Government, regarding Board of Education unauthorized (secret meetings)

EXHIBIT 73    Supplemental materials submitted by Robert Babcock, State Department of Education, to CHRO on April 7, 2000

EXHIBIT 74    Letter dated March 17, 2000 from Philip Murphy to Rev. Harrison Bonner, Chairman, City of Waterbury, Board of Ethics regarding request for documents under the Freedom of Information Act (sent to 236 Grand Street, Waterbury, CT)

EXHIBIT 75    Letter dated March 17, 2000 from Philip Murphy to Rev. Harrison Bonner, Chairman, City of Waterbury, Board of Ethics regarding request for documents under the Freedom of Information Act (sent to 12 Eldridge Street, Waterbury, CT)

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 5

EXHIBIT 76        Letter dated March 24, 2000 from Dan Shaban, Office of Corporation Counsel, City of Waterbury to Philip Murphy regarding Freedom of Information request

EXHIBIT 76a       Letter dated March 17, 2000 from Philip Murphy to Matthew Borrelli regarding request for documents under the Freedom of Information Act

EXHIBIT 77        Letter dated March 30, 2000 from Philip Murphy to Dan Shaban regarding request for documents under the Freedom of Information Act

EXHIBIT 78        Letter dated April 6, 2000 from Joseph Calabro to Philip Murphy

EXHIBIT 79        Videotape – Waterbury Community/Board Meeting, March 2000

EXHIBIT 80        Letter dated April 5, 2000 from Garret W. Post to CHRO Executive Director

EXHIBIT 81        Letter dated April 6, 2000 from Mark Moriarty, President, Waterbury City-Wide PTA Council to CHRO Executive Director

EXHIBIT 82        Letter dated March 31, 2000 from Dan Shaban to Philip Murphy regarding Freedom of Information request

EXHIBIT 83        Letter dated March 22, 2000 from Rev. Harrison Bonner to Philip Murphy

EXHIBIT 84        Letter dated March 20, 2000 from Miguel Escalera to Philip Murphy regarding City of Waterbury and Waterbury Board of Education

EXHIBIT 85        Letter dated April 6, 2000 from Dan Shaban to Philip Murphy regarding Freedom of Information request

EXHIBIT 86        Letter dated April 7, 2000 to Amalia Vazquez Bzdyra, Chairperson, Commission on Human Rights and Opportunities, regarding Hearing on Waterbury of Education Personnel Practices

EXHIBIT 87        Electronic mail dated April 6, 2000 from Henry Paine to CHRO

EXHIBIT 88        Memorandum dated April 7, 2000 from Sharon Heard-McKnight to CHRO Executive Director regarding CHRO Hearings in Waterbury on April 4th

EXHIBIT 89        Letter dated April 6, 2000 from Miguel DeSantis to Doreen Brothers, CHRO

EXHIBIT 90        Materials submitted to CHRO from Carolyn Washington

EXHIBIT 91        Materials submitted to CHRO from the Connecticut State Department of Education pertaining to studies on minority teacher recruitment and retention

EXHIBIT 92        Waterbury fact-finding hearing videotape no. 1

EXHIBIT 93        Waterbury fact-finding hearing videotape no. 2

**HEARD 447**

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 6

EXHIBIT 94   Waterbury fact-finding hearing videotape no. 3

EXHIBIT 95   Waterbury fact-finding hearing videotape no. 4

EXHIBIT 96   Public School Financial Report and Grant Applications for the School Year ending June 30, 1999 (submitted by the State Department of Education)

EXHIBIT 97   Letter dated April 24, 2000 from Dan Shaban to Philip Murphy regarding Freedom of Information request

EXHIBIT 98   Letter dated April 24, 2000 from Dan Shaban to Philip Murphy regarding Freedom of Information request

EXHIBIT 99   Letter dated April 17, 2000 from Miguel Escalera to CHRO Executive Director regarding Freedom of Information request

EXHIBIT 100   Memorandum dated March 29, 2000 to City of Waterbury Board of Ethics from Paul D'Angelo, Commissioner, regarding correspondence from David Gilmore

EXHIBIT 101   Letter dated May 3, 2000 from Miguel Escalera to CHRO Chairperson with Waterbury Board of Education's recruiting brochure

EXHIBIT 102   Minutes of the Waterbury Board of Education Special Meeting (January 31, 2000)

EXHIBIT 103   Minutes of the Waterbury Board of Education Regular Meeting (January 31, 2000)

EXHIBIT 104   Waterbury Board of Education's Resolution and Backing of vote to appoint Matthew Borrelli as Interim Superintendent of Schools

EXHIBIT 105   Resume of Matthew Borrelli

EXHIBIT 106   Resume of William R. Papallo

EXHIBIT 107   Resume of Paul V. Sequeira (with letter dated December 16, 1999 from Mr. Sequeira to Michael Andolina)

EXHIBIT 108   Document submitted by Matthew Borrelli for consideration by the Waterbury Board of Education

EXHIBIT 109   Document submitted by Matthew Borrelli for consideration by the Waterbury Board of Education

EXHIBIT 110   Letter dated May 10, 2000 from Dan Shaban to Philip Murphy regarding Freedom of Information request

EXHIBIT 111   Videotape – Matthew Borrelli speech to principals, administrators (2/9/00)

EXHIBIT 112   Job Description – Superintendent of Schools

EXHIBIT 113   Minutes of the Waterbury Board of Education Special Meeting (March 27, 2000)

HEARD 448

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 7

EXHIBIT 114    Principals Goals, February – June 2000

EXHIBIT 115    Supervisors Goals, February – June 2000

EXHIBIT 116    Petition (Bunker Hill School)

EXHIBIT 117    Superintendent's Scheduled (2/2/00 – 5/3/00)

EXHIBIT 118    Minutes of the Waterbury Board of Education Special Meeting (September 7, 1999)

EXHIBIT 119    Minutes of the Waterbury Board of Education Special Meeting (August 23, 1999)

EXHIBIT 120    Letter dated December 3, 1999 from Sean FitzMaurice to Dr. Roger Damerow regarding Grievance No. 99-2000-03 through 99-2000-07

EXHIBIT 121    Letter dated September 29, 1999 from Sean FitzMaurice to Dr. Roger Damerow regarding School Administrator's of Waterbury

EXHIBIT 122    Letter dated November 23, 1999 from Michael Eagen to Sean FitzMaurice regarding requested information

EXHIBIT 123    Fax dated February 7, 2000 from David R. Macharelli to Matthew Borrelli regarding February 17, 2000 Rotella School meeting

EXHIBIT 124    Grievance dated October 13, 1999 over hiring process

EXHIBIT 125    Waterbury Department of Education Grievance Procedure for Complaints regarding Title VI, Title IX, and Section 504

EXHIBIT 126    Policy Statement regarding Racial Balancing (March 4, 1985)

EXHIBIT 127    Waterbury Board of Education memorandum dated November 2, 1978 regarding dismissal of teachers

EXHIBIT 128    Report of the Committee on Teachers, Textbooks and Rules (June 15, 1987)

EXHIBIT 129    Committee on Rules and Regulations and Grants

EXHIBIT 130    Chapter VII – Educational Policy

EXHIBIT 131    Chapter II – Administrative Staff

EXHIBIT 132    Waterbury Board of Education Policy regarding Priority Interviewing of Non-contracted Certified Employees adopted 4-1-97

EXHIBIT 133    City of Waterbury Rules and Regulations of the Board of Education adopted 1-1-00

EXHIBIT 134    City of Waterbury Rules and Regulations of the Board of Education adopted 1-1-98

**Fact-Finding Public Hearing**
**City of Waterbury**
**Tuesday, April 4, 2000**

LIST OF EXHIBITS – Page 8

EXHIBIT 135    Key to Race/Ethnic List of Non-Tenured Teachers Hired 1999-2000 school year

EXHIBIT 136    List of Teacher Hires by Race

EXHIBIT 137    List of Administrator Hires by Race

EXHIBIT 138    Memorandum dated April 6, 2000 from Jeanne Cannata to Matthew Borrelli regarding race
denomination of teachers recommended for non-renewal

EXHIBIT 139    Letter dated April 18, 2000 from Carrie Swain regarding resignations

EXHIBIT 140    Letter dated May 3, 2000 from Carrie Swain regarding resignations

EXHIBIT 141    Letter dated March 28, 2000 from Carrie Swain regarding resignations

EXHIBIT 142    Letter dated March 14, 200 from Carrie Swain regarding resignations

EXHIBIT 143    Letter dated November 30, 1999 from Carrie Swain to Matthew Larkin regarding grievance
decisions

EXHIBIT 144    Code of Ordinances Table of Contents

EXHIBIT 145    General Provisions of Code of Ordinances pages 3-7

EXHIBIT 146    Section under Title III City Officials and Employees – Conflicts of Interest

EXHIBIT 147    Article 1:  General Powers, Duties and Qualifications of Mayor

EXHIBIT 148    Civil Service Chapter

EXHIBIT 149    Article1:  Board of Education (Sections 901-906)

EXHIBIT 150    General Regulations Section 93.03, Unlawful Discrimination Practices; Exemptions

EXHIBIT 151    Affidavit of Dr. Roger Damerow

updated 6-5-00

HEARD 450