Exhibit B

Source: Legal > / . . . / > 2nd Circuit - US Court of Appeals, District & Bankruptcy Cases, Combined
Terms: name(heard-mcknight and giordano)  (Edit Search)

*2004 U.S. Dist. LEXIS 5561, **

FRANCES TILGHMAN and SHARON **HEARD-McKNIGHT,** Plaintiffs, v. WATERBURY BOARD OF EDUCATION, MATTHEW BORRELLI, and PHILIP **GIORDANO,** Defendants.

CASE NO. 3: 01-CV-1657(RNC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2004 U.S. Dist. LEXIS 5561

March 24, 2004, Decided

**DISPOSITION:** Plaintiffs' motions for summary judgment were granted in part and denied in part.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendants, a school board and two superintendents, filed motions for summary judgment on the federal and state claims of discrimination and intentional infliction of emotional distress brought by plaintiffs, two principals. The principals, both African-American, brought their action under 42 U.S.C.S. §§ 1983 and 1988 alleging racial discrimination in employment and violations of their rights under the Connecticut Constitution and common law.

**OVERVIEW:** Principal one was hired at an elementary school, and principal two was hired at a middle school. Neither plaintiffs' one-year contract was renewed. Principal one complained that she was badly treated from the start, with many teachers and parents writing complaints about her that she was hostile and biased against white teachers and students. Principal two asserted that she had no real trouble until she reported a popular teacher for sexually harassing a student. The court found that principal one made out a prima face case of discrimination, as she was a member of a protected class, possessed the basic job skills, and was terminated. The court held that defendants were entitled to summary judgment, because she failed to carry the burden overriding the legitimate, nondiscriminatory reason for her termination, which was supported by the many letters and affidavits from parents. The court found that principal two presented enough evidence to create a triable issue of fact on the question of whether superintendent two's alleged reasons for his negative recommendation was false. Neither plaintiffs' claims for intentional infliction of emotional distress survived summary judgment.

**OUTCOME:** The court granted in full defendants' motion for summary judgment as to the claims made by principal one and denied defendants' motion, in part, as to the claims made by principal two with regard to principal two's discrimination claims against superintendent two and granted the same, in part, as to principal two's claim with regard to intentional infliction of emotional distress.

**CORE TERMS:** summary judgment, administrator, teacher, staff, prima facie case, termination, deposition, volunteer, racist, racial discrimination, pretext, staff members, reappointment, terminated, matter of law, triable issue, evaluation process, recommendation, complaining, subjective, motive, resign, hired, personal knowledge, propaganda, nonmovant, defeat, superintendent, inaccessible, communicated

**LexisNexis (TM) HEADNOTES - Core Concepts -** ♦ Hide Concepts

Civil Procedure > Summary Judgment > Summary Judgment Standard

**HN1** Summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must review the record as a whole, credit all evidence favoring the nonmovant, give the nonmovant the benefit of all reasonable inferences, and disregard all evidence favorable to the movant that a jury would not have to believe. Granting summary judgment in a proper case helps conserve judicial and litigant resources because, if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law, a verdict in favor of the nonmovant could not be sustained. More Like This Headnote

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
Evidence > Procedural Considerations > Burdens of Proof
Education Law > Discrimination > Employment > Appointment & Promotion

**HN2** Employment discrimination claims are analyzed using the three-step burden-shifting framework adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668 (1973). The plaintiff has the initial burden of making a prima facie case by showing that she belongs to a protected class, was performing her duties satisfactorily, and suffered an adverse employment action in circumstances supporting an inference of discrimination. If that showing is made, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the challenged action. When such a reason is articulated, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
Education Law > Discrimination > Employment > Appointment & Promotion

**HN3** Plaintiffs' Fourteenth Amendment right to be free from discrimination in employment on the basis of race is coextensive with their right to be free from racial discrimination in employment under Title VII. The protection afforded them by the Connecticut Constitution's guarantee of equal treatment is coextensive with the protection provided by the Fourteenth Amendment. Title VII jurisprudence covers all of plaintiffs' discrimination claims. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
Education Law > Discrimination > Employment > Appointment & Promotion

**HN4** To defeat summary judgment, a plaintiff, as the non-moving party, must present sufficient evidence to support a finding by a jury that defendants' explanation for the termination is false. It is not enough for her to reply with allegations about discriminatory intent or state of mind; she must offer concrete evidence. A plaintiff's own sworn statements may be enough to establish a triable issue, but only as to matters within her personal knowledge. A party's affidavit, which contradicts her own prior deposition testimony, should be disregarded on a motion for summary judgment. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
Education Law > Discrimination > Employment > Appointment & Promotion

**HN5** Sufficient evidence to support a finding of pretext can defeat a motion for summary judgment. When a plaintiff presents such evidence, but does not present evidence showing a racial motive, the Second Circuit holds that the district court should

examine the entire record and make the case-specific assessment as to whether a finding of discrimination may reasonably be made. Whether summary judgment is appropriate in such a case depends on, among other things, the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case. More Like This Headnote

Labor & Employment Law > Discrimination > Racial Discrimination > Defenses & Exceptions
Education Law > Discrimination > Employment > Appointment & Promotion
HN6± While employers may lawfully base employment decisions on subjective criteria, the Second Circuit disfavors subjective explanations for adverse employment decisions because any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case. More Like This Headnote

Torts > Intentional Torts > Intentional Infliction of Emotional Distress
Civil Procedure > Jury Trials > Province of Court & Jury
HN7± Under Connecticut law, defendants are liable for intentional infliction of emotional distress only if their conduct was extreme and outrageous. Whether defendants' conduct was extreme and outrageous is a question, in the first instance, for the court. More Like This Headnote

Torts > Intentional Torts > Intentional Infliction of Emotional Distress
HN8± Under Connecticut law, racial discrimination by itself does not automatically constitute sufficiently outrageous conduct. More Like This Headnote

**COUNSEL:** [*1] For Plaintiff, Frances Tilghman: John R. Williams, Williams & Pattis, New Haven, CT.

For Sharon Heard-McKnight: John R. Williams, Williams & Pattis, New Haven, CT.

For Defendant, Waterbury Bd of Ed: Gabriel Joseph Jiran, Shipman & Goodwin, Hartford, CT. Gary S. Starr, Shipman & Goodwin, Hartford, CT.

For Matthew Borrelli: Gabriel Joseph Jiran, Shipman & Goodwin, Hartford, CT. Gary S. Starr, Shipman & Goodwin, Hartford, CT.

For Philip Giordano: Gabriel Joseph Jiran, Shipman & Goodwin, Hartford, CT. Gary S. Starr, Shipman & Goodwin, Hartford, CT.

**JUDGES:** Robert N. Chatigny, United States District Judge.

**OPINIONBY:** Robert N. Chatigny

**OPINION:** RULING AND ORDER

Frances Tilghman and Sharon Heard-McKnight, both of whom are African-American, bring this action under 42 U.S.C. §§ 1983 and 1988 against the Waterbury Board of Education (" the Board"), Matthew Borrelli and Philip Giordano, alleging racial discrimination in employment in violation of the Fourteenth Amendment of the United States Constitution and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. They also allege violations of their [*2] rights under the Connnecticut Constitution and common law. Defendants have filed motions for summary judgment on plaintiffs' federal and state claims. For the reasons stated below, summary judgment is granted as to the claims made by

Tilghman, and granted in part as to the claims made by Heard-McKnight.

I. Background

The pleadings, depositions, answers to interrogatories and affidavits on file show the following.

In August 1999, the Board hired Tilghman and Heard-McKnight as principals of Bunker Hill Elementary School and Wallace Middle School, respectively. Both schools have racially mixed student bodies, but the membership of each school's Parent Teacher Association (PTA) is predominantly white. Both plaintiffs were given one year contracts, neither of which was renewed.

Heard-McKnight's staff and PTA members were helpful to her at first, generally speaking. But she lacked influence with the central office; to get resources she had to turn to a retired principal who worked with her as an educational consultant, Joseph Cavanaugh. In addition, she had to spend so much time on safety issues that she was unable to devote much time to the instructional leadership [*3] she wanted to provide. Nevertheless, she had no real trouble until she reported a popular teacher to the Department of Children and Families for sexually harassing a student. After that, she claims, white teachers and PTA members began efforts to get rid of her.

Tilghman complains that she was badly treated from the start. Many teachers and parents wrote complaints about her, saying that she was hostile, inaccessible, and biased against white teachers and students. In part, this was due to the fact that she did not use white PTA volunteers at the school, although her predecessor (who was also African-American) made substantial use of them. She alleges that she tried to encourage nonwhite parents to get involved in the PTA but the white members resisted her efforts. The Board received a petition signed by seventy-six parents opposing her reappointment. She alleges that the petition was orchestrated by racist white PTA officials, and that no black parent signed it except one, Shalaine Jones. n1


- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The record shows that Tilghman allowed Jones to work at the school as a PTA volunteer. It appears to be undisputed that Jones complained to the superintendent that she frequently heard Tilghman make comments reflecting a racial bias against whites.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*4]

In February 2000, the Board hired a new superintendent, defendant Matthew Borrelli. He began to evaluate non-tenured principals immediately because under state law such principals could be terminated if they were informed of his negative recommendation by April 1. In early March, he held meetings with parents and staff to evaluate Tilghman and Heard-McKnight, neither of whom was tenured. In mid-March, Jones and two administrators (Eileen Arisian and Anne Brophy) complained that Tilghman had retaliated against them, or threatened retaliation, because they had complained about her. Tilghman alleges that the two administrators wanted her job and, in effect, fabricated the retaliation complaints. Jones complained that she was effectively excluded from participating in a school pageant she had been working on, a complaint Tilghman denies.

On March 20, Borrelli told Heard-McKnight that he would recommend to the Board that she not be reappointed. She immediately submitted her resignation. At the same time, a white principal, Roberta Zlokower, also resigned because she had been told that Borrelli was

recommending her termination. On March 24, Borrelli sent Tilghman a letter [*5] saying he would recommend that she not be reappointed. Tilghman appealed. In August 2000, a subcommittee of the Board held a five-day hearing on the appeal, at which Tilghman was represented by her present counsel. The full Board then voted not to reappoint her.

In August 2001, plaintiffs brought this action.

II. Discussion

HN1 Summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must review the record as a whole, credit all evidence favoring the nonmovant, give the nonmovant the benefit of all reasonable inferences, and disregard all evidence favorable to the movant that a jury would not have to believe. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). Granting summary judgment in a proper case helps conserve judicial and litigant resources because, if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law, a verdict in favor of the nonmovant could not be sustained. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Defendants argue correctly that plaintiffs have provided no allegations or evidence that Giordano was involved in the alleged wrongs. Plaintiffs' complaint alleges only that Giordano was an ex officio member of the Board. The complaint does not allege that he took any action related to their claims. Nor do plaintiffs' later pleadings and affidavits contain any such allegation. Accordingly, the claims against him must be dismissed.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*6]

A. Employment Discrimination Claims

HN2 Employment discrimination claims are analyzed using the three-step burden-shifting framework adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). n3 The plaintiff has the initial burden of making a prima facie case by showing that she belongs to a protected class, was performing her duties satisfactorily, and suffered an adverse employment action in circumstances supporting an inference of discrimination. If that showing is made, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the challenged action. When such a reason is articulated, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for discrimination.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 HN3 Plaintiffs' Fourteenth Amendment right to be free from discrimination in employment on the basis of race is coextensive with their right to be free from racial discrimination in employment under Title VII. St Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n. 1, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). In addition, the protection afforded them by the Connecticut Constitution's guarantee of equal treatment is coextensive with the protection provided by the Fourteenth Amendment. Zapata v. Burns, 207 Conn. 496, 504, 542 A.2d 700 (1988). Thus, the Title VII jurisprudence covers all of plaintiffs' discrimination claims.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*7]**

1. Tilghman's Discrimination Claims

Tilghman has made a prima facie case of discrimination. It is undisputed that she is a member of a protected class, possessed the basic skills necessary for her job, n4 and was terminated. Defendants argue with some force that she has failed to show that her termination occurred in circumstances permitting a reasonable inference of discrimination. However, her affidavit in opposition to summary judgment states that there is a history of racial discrimination by the Board in hiring and in the allocation of funds across schools (Tilghman Aff. PP3-4, 116). Those plausible assertions, combined with the undisputed fact that she was fired by a white superintendent and a majority-white Board, are sufficient to complete a prima facie case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Defendants have articulated a legitimate, nondiscriminatory reason for the termination. They state that Tilghman's employment was **[*8]** terminated because she created a divisive atmosphere at Bunker Hill, alienating parents and exacerbating racial tensions. Their explanation is supported by substantial evidence in the form of complaints by parents, teachers, and other staff members, which portray Tilghman as autocratic, unhelpful, inaccessible, and, in particular, hostile to white parents and students. This evidence, which is attached to defendants' memorandum in support of their motion for summary judgment on Tilghman's claims, includes: (1) a petition signed by seventy-six parents asking the Board not to renew its contract with Tilghman (Ex. M); (2) letters from parents, both white and African-American, complaining that Tilghman was unfavorable to white parents and children, along with an administrator's report summarizing more such complaints (Ex. F, H, Y-Z); (3) letters from staff members complaining that Tilghman refused to allow white parents to volunteer in the school, but allowed an African-American parent, Shalaine Jones, to volunteer daily (Ex. V, X, Z); (4) a letter from a member of the local PTA protesting Tilghman's statement, reported in a Waterbury newspaper, that the PTA excluded minority parents **[*9]** (Ex. AA); (5) letters complaining that Tilghman retaliated against or threatened staff members and Jones because they complained about her to Borrelli (Ex. G, J-K); (6) letters from staff members asserting that Tilghman had threatened them with loss of their jobs without good reason (Ex. W, BB); (7) a letter from a teacher complaining that Tilghman had humiliated her in public and placed an unfair memo of reprimand in her file (Ex. T); and (8) notes from a meeting between Borrelli and parents in which parents offered severe criticisms of Tilghman (Ex. N).

*HN4* To defeat summary judgment, Tilghman must present sufficient evidence to support a finding by a jury that defendants' explanation for the termination is false. It is not enough for her to reply with allegations about discriminatory intent or state of mind; she must offer "concrete evidence." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61-62 (2d Cir. 1988). Her own sworn statements may be enough to establish a triable issue, but only as to matters within her personal knowledge. Danzer v. Norden Sys., 151 F.3d 50, 57 (2d Cir. 1998). Moreover, "a party's affidavit which contradicts **[*10]** [her] own prior deposition testimony should be disregarded on a motion for summary judgment." Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987).

Taking the record as a whole, Tilghman has not created a triable issue of pretext. The

evidence she provides consists solely of her own affidavit. The affidavit asserts generally that the criticism that she did little to include white parents is unsubstantiated. (Aff. P66.) As just discussed, however, the record contains letters from parents and staff members --none of them parties here --complaining that she disfavored white parents and children. Tilghman's affidavit does not deny that she allowed an African-American parent (Shalaine Jones) to volunteer at the school while refusing to allow white parents to do so. The affidavit states that Tilghman initially permitted Jones to volunteer because she needed someone who could speak Spanish that day, but it does not explain why she continued to request and allow Jones to do volunteer work in the school every day while refusing similar help from white parents. (Aff. PP26, 28.) The affidavit does not deny that Tilghman stated to a newspaper that the [*11] PTA did not want to include minorities. Nor does it rebut the allegation that she humiliated a teacher in public and put an unfair memo of reprimand in the teacher's file. To the extent Tilghman's affidavit does contest defendants' evidence with specific assertions, it does so almost invariably with statements that must be disregarded. The affidavit asserts that Jones was the only African-American parent to sign the petition asking that Tilghman's contract not be renewed, and that the PTA used lies and racist propaganda to collect signatures. (Aff. PP90-93.) These assertions contradict Tilghman's deposition testimony that she did not know that only one signer was African-American (Defs. 'Mem. Ex. A, Tr. at 453-54) and that she knew very little about the circulation of the petition (Tr. at 231-32). The affidavit asserts that Tilghman did not permit white PTA members to do volunteer work at the school because they did not volunteer for the needed work, intimidated her, created a bottleneck in the limited space of the school office, went through mail without authorization, and may have stolen a pocketbook and six laptop computers. (Aff. PP19-22, 25, 27, 32-33.) At her [*12] deposition, however, Tilghman testified that the PTA members at issue volunteered to help in the office, that she did not call on them despite a secretarial shortage (Tr. at 298-304), and that they did nothing to intimidate her (Tr. at 126-32). Moreover, she said nothing at her deposition about a problem with the mail, a pocketbook or computers. The affidavit denies that anything was said at Borrelli's meeting with parents to verify that Tilghman created a racially divisive climate (Aff. P56) or was inaccessible or condescending (Aff. PP106-07). But the affidavit does not explain how Tilghman knows what was said at the meeting outside her presence and hearing.

Tilghman's affidavit does specifically assert on personal knowledge that she did not retaliate against Jones or employees who criticized her. (Aff. PP61, 79-89.) Crediting these assertions, and viewing them in a light most favorable to her, they are insufficient to create a triable issue of pretext. They relate to only one of many concerns that were presented to Borrelli and the Board, and rebut only a small part of the evidence presented by defendants, most of which is uncontradicted and unimpeached.

Tilghman's [*13] affidavit is also notably weak on the ultimate issue of racial animus. The affidavit asserts that Borrelli used a different process for evaluating Tilghman than he used for white administrators. (Aff. PP45-46, 95.) However, Tilghman conceded at her deposition that she does not know what evaluation process Borrelli used for other administrators. (Def.'s Mem. Re Tilghman Ex. A, Tr. at 382-85.) The affidavit asserts that Borrelli held a meeting to discuss Tilghman's performance and invited only white parents to attend. (Aff. PP101-03.) But Tilghman testified at her deposition that she does not know how notice of the meeting was sent out (Tr. at 378), that the meeting was attended by the president of the Waterbury NAACP, and that at least one African-American parent was also present (Tr. at 242-43, 378). Her affidavit asserts that Borrelli received feedback about her performance only from white racist PTA officials. (Aff. PP67, 112.) But she testified at her deposition that Borrelli received feedback about her from persons other than those PTA officials. (Tr. at 235-36, 240, 253-56, 323-24, 327, 377-78.) And she offers no evidence that the treatment she received [*14] from the Board differed from the Board's treatment of white administrators. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Tilghman asserts that "there were administrators who did not meet the standard but were given time to make improvements," (Aff. P39), but does not specify the race of those administrators.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The remaining assertions in Tilghman's affidavit concerning the motive for her termination take the form of conclusory allegations and unexplained assertions about facts that would not normally be within her personal knowledge. Her affidavit asserts that Borrelli's one objective was to "discriminate, intimidate, harass, and terminate me." (Aff. P115.) But she does not explain how she knows that this was his state of mind. It asserts that Borrelli orchestrated the use of racist propaganda in a petition against her (Aff. PP90-91), but she does not say how she knows that Borrelli orchestrated the petition, or what the racist propaganda was. The affidavit further asserts that the Board approved her termination because certain members wanted [*15] to terminate newly hired minority administrators, and that African-American members of the Board were given false information. (Aff. PP117, 125.) But she provides no explanation about how she knows what members of the Board were thinking or what information was given to them.

Accordingly, Tilghman's claim that she was terminated because of her race cannot survive summary judgment. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Plaintiffs' complaint refers to other adverse actions besides her termination. It alleges that defendants conspired with the PTA to subject her to "vicious and racist" harassment (Comp. P25), and that they failed to provide her with adequate secretarial support, although white principals received such support (Comp. P30). No evidence has been provided to support findings of any such harassment or disparate treatment.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

2. Heard-McKnight's Discrimination Claims

Heard-McKnight claims, in essence, that Borrelli undertook to oppose her reappointment because of her race and thereby caused her to resign. n7 In support of this [*16] claim, she alleges that Borelli used a different evaluation process for her than for white administrators, held secret meetings with white PTA members to discuss his evaluation of her, heard racist views expressed at those meetings, and endorsed those views. (Comp. PP32, 33, 35.) She does not allege any wrongdoing by the Board. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 The complaint does not assert that Borrelli deliberately took specific actions to make Heard-McKnight's work environment intolerable in order to force her to resign, so it cannot be construed to allege constructive discharge. Kader v. Paper Software, Inc., 111 F.3d 337, 339 (2d Cir. 1997).

n8 In the absence of any such allegations, Heard-McKnight's discrimination claims are construed to be directed against Borrelli only.

Get a Document - by Party Name - heard-mcknight AND giordano
Case 3:01-cv-01657-DFM Document 87-11 Filed 05/11/2004 Page 10 of 13
Page 9 of 12

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Heard-McKnight's discrimination claims against Borrelli are governed by the same three-step burden shifting analysis used above. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). Whether she has met her [*17] initial burden of establishing a prima facie case is questionable. She offers no evidence in her affidavit or elsewhere of any circumstances surrounding Borrelli's negative recommendation that support an inference of discrimination. However, the record does contain Tilghman's assertions about past racial discrimination. Giving Heard-McKnight the benefit of those assertions, she has met her minimal burden of presenting a prima facie case.

Defendants have met their burden of articulating a legitimate, nondiscriminatory reason for Borrelli's decision to oppose Heard-McKnight's reappointment. According to Borrelli's affidavit, there were a variety of problems with Heard-McKnight's performance. His affidavit portrays her as distant from staff, insufficiently energetic in dealing with school problems, and lacking in leadership. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Borrelli's affidavit refers to, among other things, (1) alleged complaints from staff that Heard-McKnight communicated poorly with them and did not respond to their suggestions (PP19-20); (2) Heard-McKnight's alleged failure to address the problems raised by a signed complaint from parents about school safety, or to handle disciplinary problems effectively (PP22, 25, 28); (3) her alleged failure to show leadership, passion, or vision to move the school forward (P28); (4) her alleged poor handling of a meeting at which staff complaints about her performance were discussed (P28); and (5) her alleged tendency to allow another administrator, Joseph Cavanaugh, to be the de facto principal (P28). Borrelli also alleges that Heard-McKnight performed poorly in other respects, but his affidavit does not state clearly that these deficiencies were reasons for his negative recommendation.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*18]

Heard-McKnight has presented enough evidence to create a triable issue of fact on the question whether Borrelli's alleged reasons for his negative recommendation are false. Her affidavit provides sworn contradictions, some of them quite specific, to all of Borrelli's alleged reasons for opposing her reappointment. She states that the complaints about her communication with staff members were based on the staff's anger at her for reporting the popular teacher who sexually harassed a student, and that she in fact communicated frequently and openly with staff. (Aff. PP75-83, 96-101). She states that she gave a great deal of attention to issues of school safety and discipline, and describes the nature of the problems and her responses to them in detail. (Aff. PP18-22, 32-42, 61-65, 113, 126-31, 138-39.) She states that she was prevented from dealing with instructional issues by the amount of time she had to spend handling disciplinary problems, which should have been handled by her three vice-principals, who were not doing their jobs, two of them because they were sabotaging her and not competent, and the third because of inexperience. (Aff. PP26-29, 110, 140-42). [*19] She adds that the central office's failure to give her resources also tended to prevent her from doing her job. (Aff. PP58, 133-36.) She asserts that she did not do well in the meeting with Borrelli and her staff because, although well-prepared, she was forced to defend herself against lies. (Aff. P101.) She responds to the allegation that she allowed Cavanaugh to become the de facto principal of the school by providing a different picture of Cavanaugh's role. She asserts that Cavanaugh, a retired principal hired as a consultant, had greater influence in Waterbury and could get resources

from the central office when she could not. (Aff. P115.)

As noted earlier, HN5 sufficient evidence to support a finding of pretext can defeat a motion for summary judgment. When a plaintiff presents such evidence, but does not present evidence showing a racial motive, the Second Circuit holds that the district court should "examine the entire record and ... make the case-specific assessment as to whether a finding of discrimination may reasonably be made." Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001), . Whether summary judgment is appropriate in [*20] such a case depends on, among other things, "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." Reeves, 530 U.S. at 148-49. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 Justice Ginsburg has expressed the view that a plaintiff's prima facie case of discrimination combined with a triable issue of pretext will usually suffice to defeat an employer's motion for judgment as a matter of law. Reeves, 530 U.S. at 154 (Ginsburg, J., concurring).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Heard-McKnight's claim requires such a case-specific assessment because she offers no evidence, in her affidavit or otherwise, that Borrelli's negative recommendation was motivated by racial animus. In her Rule 56(a)(2) statement, she asserts that "a different process was used for the plaintiff," presumably meaning that she was subjected to a different evaluation process than white principals. (PP38-39.) However, she admitted at her deposition [*21] that she does not know what process was used for other principals, and that she has no evidence that the process Borrelli used for her had a racial motive. (Defs. 'Mem. Re Heard-McKnight, Ex. A, Tr. at 316-22.) n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 In addition, she testified that a white principal, Roberta Zlokower, also resigned while being subjected to an evaluation process that was the same as her own, as far as she knew. (Id., Tr. at 319-20, Heard-McKnight Aff. P143.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Nevertheless, Heard-McKnight's discrimination claims survive summary judgment. The evidence offered to substantiate Borrelli's explanation for his action is far from overwhelming. It consists largely of references to his own subjective judgment about Heard-McKnight's performance. HN6 While employers may lawfully base employment decisions on subjective criteria, the Second Circuit disfavors subjective explanations for adverse employment decisions because "any defendant can respond to a [discrimination charge] with a claim of some subjective preference or [*22] prerogative and, if such assertions are accepted, prevail in virtually every case." Byrnie v. Town of Cromwell Bd. of Educ,243 F.3d 93, 104-05-05 (internal quotation marks omitted). Moreover, insofar as Borrelli has raised specific reasons for his negative evaluation, Heard-McKnight has met them with detailed, plausible rebuttals. Summary judgment is therefore inappropriate, despite Heard-McKnight's weak prima facie case and her failure to present evidence of a racial motive. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 The existence of a triable issue of pretext with regard to Heard-McKnight's discrimination claims against Borrelli does not create such an issue with regard to Tilghman's claims against Borelli and the Board. As explained in the text, Tilghman's employment was terminated by the Board, not Borrelli, after a contested hearing, and the Board's nondiscriminatory explanation for its action is supported by substantial evidence that is uncontradicted and unimpeached. Tilghman offers no evidence that the Board's decision to terminate her employment was linked to Borrelli's decision to oppose Heard-McKnight's reappointment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*23]

B. Intentional Infliction of Emotional Distress Claims

HN7 Under Connecticut law, defendants are liable for intentional infliction of emotional distress only if their conduct was "extreme" and "outrageous." Appleton v. Board of Educ., 254 Conn. 205, 210-11 757 A.2d 1059 (2000). Whether defendants' conduct was extreme and outrageous is a question, in the first instance, for the court. Bell v. Bd. of Educ. of West Haven, 55 Conn. App. 400, 409-410, 739 A.2d 321 (1999).

Nowhere in their submissions do plaintiffs cite any particular conduct of the defendants as constituting intentional infliction of emotional distress. n13 Crediting the allegations for which plaintiffs have provided at least some evidence, the defendants failed to give plaintiffs adequate support to do their jobs; communicated with white parents and staff about plaintiffs' performance; applied to plaintiffs an evaluation process that was different from the one normally used and mandated in a union contract; told Heard-McKnight that she would not be recommended for reappointment; and terminated Tilghman's employment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 HN8 Under Connecticut law, racial discrimination by itself does not automatically constitute sufficiently outrageous conduct. Huff v. West Haven Bd. of Educ., 10 F. Supp. 2d 117, 123 (D. Conn. 1998).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*24]

Claims based on objectively worse conduct have been rejected as a matter of law in similar cases. For example, in Appleton, 254 Conn. at 211, condescending comments, requiring the plaintiff to undergo two forced psychiatric exams, telling the plaintiff's daughter that the plaintiff was acting "differently," forcing the plaintiff to resign, and subjecting the plaintiff to the indignity and humiliation of an unwanted and unnecessary police escort out of the building, taken together, did not constitute extreme and outrageous conduct. In Dollard v. Board of Education of Orange, 63 Conn. App. 550, 552-54, 777 A.2d 714 (2001), a concerted plan to force the plaintiff to resign, carried out by hypercritically examining every small detail of her professional and personal conduct and transferring her to a school she did not want, did not constitute such conduct. In light of these precedents, plaintiffs' claims must be rejected as a matter of law.

III. Conclusion

Accordingly, the motion for summary judgment as to the claims made by Tilghman [Doc. # 62] is hereby granted in full, and the motion for summary judgment as to the claims made [*25] by Heard-McKnight [Doc. # 59] is granted in part and denied in part. As a result of

this ruling and order, the claims that remain for trial are Heard-McKnight's claims for racial discrimination against Borrelli. All other claims are dismissed.

So ordered.

Dated at Hartford, Connecticut this 24th day of March 2004.

Robert N. Chatigny

United States District Judge

Source: Legal > / . . . / > 2nd Circuit - US Court of Appeals, District & Bankruptcy Cases, Combined
Terms: name(heard-mcknight and giordano)  (Edit Search)
View: Full
Date/Time: Tuesday, April 27, 2004 - 5:46 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.